STATE OF MICHIGAN

IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

THE PEOPLE OF THE STATE OF MICHIGAN,

v                          No. 15-1533

DONNIE THOMAS-DAWSON,

Defendant(s).

_____/

WAIVER TRIAL

Before the Honorable SHANNON NICOL WALKER

Third Judicial Circuit Court Judge

Detroit, Michigan

On Tuesday, February 16, 2016

APPEARANCES:

MEGHAN MATHEWS, Assistant Prosecuting Attorney.

Appearing on behalf of the People.

LILLIAN DIALLO, ESQ.

Appearing on behalf of the Defendant(s).

GARY COURY
Official Court Reporter
CSMR/CER 3827

## TABLE OF CONTENTS

WITNESSES:
        GORDON JOHNSON
        Direct examination by Ms. Mathews            9
        Cross examination by Mr. Diallo             32
        Redirect examination by Ms. Mathews         49
        Recross examination by Ms. Diallo           51

        MOHAMMED BIN RABED
        Direct examination by Ms. Mathews           55
        Cross examination by Ms. Diallo             64
        Redirect examination by Ms. Mathews         69
        Recross examination by Ms. Diallo           70

        BREAUN GLASPER
        Direct examination by Ms. Mathews           73
        Cross examination by Ms. Diallo             79

        MAURICE ALEXANDER
        Direct examination by Ms. Mathews           82
        Cross examination by Ms. Diallo             85
        Redirect examination by Ms. Mathews         87

        RAYMOND DIAZ
        Direct examination by Ms. Mathews           89
        Cross examinaton by Ms. Diallo              99

        TREY LYONS
        Direct examination by Ms. Mathews          102
        Cross examination by Ms. Diallo            107
        Redirect examination by Ms. Mathews        109

        Nicholas DeDeluk
        Direct examination by Ms. Mathews          111
        Cross examination by Ms. Diallo            114

EXHIBITS:
        People's exhibits 1 thru 12 marked          18
        People's exhibits 1, 4, 2, 3, 12 admitted   23
        People's exhibit 6 admitted                 27
        People's exibits 7 admitted                 29
        People's exhibits 8 thru 11 admitted        31
        People's exhibits 13 thru 66 marked         91
        People's exhibit 66 admitted                94
        People's exhibits 13 thru 65 admitted       97

        Defense exhibits A Thru F marked            35
        Defense exhibits A thru F admitted          36

1
                              DETROIT, MICHIGAN
2
                              TUESDAY, FEBRUARY 16, 2016
3
                                10:29 A.M.
4

5
                         -          -         -  -
6
                    THE   CLERK:   Calling  case  number  15-1533,
7
      People versus Donnie Thomas-Dawson.
8
                    THE COURT:  Appearances.
9
                    MS. MATHEWS:  Good morning, Your Honor, Meghan
10
      Mathews for the People.
11
                    MS.  DIALLO:  Your  Honor,  good  morning  to
12
      you and your staff, Lillian Diallo on behalf of Mr. Donnie
13
      Thomas-Dawson, who's present in front of me.
14
                    THE   COURT:   Good  morning  everyone.   Good
15
      morning Mr. Thomas-Dawson.
16
                    THE DEFENDANT:  Good morning, Your Honor.
17
                    THE  COURT:  This  matter  is  scheduled  for
18
      a bench trial this morning.  Are the People ready to proceed?
19
                    MS. MATHEWS:  The People are, Your Honor.
20
                    THE  COURT:  Is  there  a  motion  to  sequester
21
      any witnesses in this matter?
22
                    MS.  MATHEWS:  Yes,  please,  Your  Honor.  We
23
      would  ask  that  all  potential  witnesses  be  sequestered  with
24
      the exception of my officer-in-charge, Officer Stewart.
25
                    THE  COURT:  Any  objection  to  the  officer-

BDC                              3

1  in-charge remaining in the courtroom, Miss Diallo?

2          MS. DIALLO:  No, objection, Your Honor.

3  And I'd just like the record to reflect that I had an

4  investigator in this matter who interviewed Mr. Dawson at

5  the jail.  There were no witnesses that were identified

6  to me in this particular case.  I'd just like the record

7  to reflect.

8          THE COURT:  If there are any witnesses sitting

9  in the courtroom, if you could, please, step out of the

10  courtroom at this time.

11          Do you see any of your witnesses in the

12  courtroom, Miss Mathews?

13          MS. MATHEWS:  No, none of my witnesses.

14          THE COURT:  Opening statements?

15          MS. MATHEWS:  Your Honor, very briefly.

16  **OPENING BY MS. MATHEWS**

17          This matter is, involves the armed robbery

18  and assault with intent to murder that occurred, along with

19  two counts of felonious assault and one count of assault

20  with intent to do great bodily harm, felony firearm and

21  carrying concealed weapon.  This occurred, Your Honor, on

22  the 27th of January 2015, at  a gas station located at 10100

23  East Warren.

24          The Court will hear from Mr. Gordon Johnson,

25  who will indicate that he was up there and he did odd jobs

BDC                                4

1    and was paid by the manager.  He was working at that, in
2    the morning at 12:30 a.m. on that date.  While he was in
3    there two gentlemen came up to the gas station, came in.
4    One of which was Mr. Thomas-Dawson.  The other one was Mr.
5    Brown his accomplice.  They came in.  They purchased
6    somethings.  Mr. Brown left the gas station proper, the
7    building.  Mr. Thomas-Dawson approached Mr. Gordon Johnson
8    with a gun in his hand.  Comes up to him and makes him come
9    outside.

10            This will be, you'll hear Mr. Johnson speak
11   of this.  And that testimony will be corroborated by the
12   clerk that was also working that night.  Mr. Mohammed
13   Binrabed.

14            Once outside, Mr. Johnson will testify that
15   Mr. Brown approached, he and Thomas-Dawson, Mr.
16   Thomas-Dawson.  Mr. Thomas-Dawson also had the gun, still
17   had the gun to him.  That they took his coat, his True
18   Religion coat, the cash that he had.  'Where's the rest
19   of it?'  When Mr. Johnson indicated, 'didn't have anything
20   else.'  Then, Mr. Thomas-Dawson started to hit him with
21   the gun.  Hit him at least four times throughout his face
22   and his head leaving, making Mr. Johnson loose approximately
23   five teeth.  And we will see pictures and see the injuries.
24            After Mr. Johnson then turns, swings and
25   strikes Mr. Thomas-Dawson, takes off running.  At which

BDC                              5

1   time Mr. Thomas-Dawson starts to shoot at least five time.
2   Bang, Bang, Bang as Mr. Gordon Johnson is trying to run
3   away.

4              Immediately   thereafter,   Mr.   Thomas-Dawson
5   and Mr. Brown jump into the dark colored Monte Carlo with
6   the plastic in the backwidow and take off.

7              Your Honor, you will hear from Miss Glasper,
8   who approximately 20 minutes later was at a liquor store
9   on the, I believe it was on Chalmers, and at that time she
10  can testify that she in fact saw Mr. Thomas-Dawson getting
11  out of that vehicle dressed in the same yellow shirt that
12  Mr. Gordon Johnson will testify to and that Mister, he was
13  with Mr. Brown who had a weapon.  She will also testify
14  that went to a lineup the next day and was able to pick
15  him out as the person, got out of that vehicle  and was
16  with Mr. Brown who's armed with a gun.

17             Your  Honor, you will hear from the clerk
18  as I've indicated.  You will hear from the evidence techs
19  that went out and processed the scene, as well as the
20  officers that arrested Mr. Thomas-Dawson and Mr. Brown,
21  20 minutes after Miss Glasper saw them.  Again, approximately
22  half a mile away.  Mr. Brown and Mr. Thoms-Dawson were in
23  the Monte Carlo, dark colored Monte Carlo, with the back
24  window covered in plastic.

25             Officers  pull  up.   Mr.  Brown  is  standing

BDC                              6

1   outside of the vehicle.  Mr. Thomas-Dawson is in the driver's

2   seat.  When Mr. Brown sees the officers, he takes off

3   running.  Runs through the neighborhood.  You'll hear the

4   officer indicate that they gave chase.  That they did loose

5   sight of him for a while, but he was apprehended as wll

6   as Mr. Thomas-Dawson.  They'll indicated that they did

7   apprehend him at the vehicle and he was arrested.

8           The next day he was brought to the lineup

9   where he was identified by Mr. Gordon Johnson and, again,

10  Miss Glasper.

11          I think that, Your Honor, at the conclusion

12  of the testimony and the proofs presented, the Court will

13  agree that, in fact, the People have proven their case beyond

14  a reasonable doubt and that will find Mr. Thomas-Dawson

15  guilty of the armed robbery of Mr. Gordon Johnson, of the

16  two counts of felonious assault, one hitting him with the

17  gun and the other shooting at him, the carrying the concealed

18  weapon, the felony firearm, the assault with intent to do

19  great bodily harm and the assault with intent to murder.

20          Thank you.

21          THE COURT:  Miss Diallo?

22          MS. DIALLO:  Thank you.

23          **OPENING STATEMENT**

24          Your Honor, quite simply, Mr. Thomas, Donnie

25  Thomas-Dawson indicates that he had no part in any of the

BDC

1  things that happened that particular evening. There are

2  cameras, which we find interesting, all over, and there

3  are going to be pictures and exhibits introduced that really

4  should have a vantage point of exactly everything they're

5  saying, and what actually happened, and the people that

6  did it. As of this time, Your Honor, there is absolutely

7  nothing that ties Mr. Thomas-Dawson to that particular scene.

8          Judge, we would ask that you listen to the

9  evidence. I'm not quite certain about the AWIM. Just one

10  second. I'll take a look at the medical records that the

11  prosecutor says she has, Judge. But we definitely don't

12  believe that what's been described rises to the level of

13  assault with intent to murder with the facts that she stated

14  just in her opening. We would hold the prosecutor at this

15  time to her proofs in this matter, Judge. And we would

16  ask that you listen intently. And we will talk later about

17  whatever verdict her Honor will reach.

18          Thank you

19          THE COURT: You want to call your first

20  witness?

21          MS. MATHEWS: Thank you, Your Honor. At

22  this time the People call Gordon Johnson.

23          THE COURT REPORTER: Spell your name, please.

24          MR. JOHNSON: Gordon, G-O-R-D-O-N, Johnson,

25  J-O-H-N-S-O-N.

BDC

1       THE COURT REPORTER:  Thank you.

2       THE CLERK:  Raise your right hand, sir.se

3       "Do you solemnly swear or affirm the

4    testimony you are about to give to the Court

5    to be the truth, so help you God?"

6       MR. JOHNSON:  Yes, ma'am.

7       THE CLERK:  Thank you.

8       G O R D O N   J O H N S O N

9       WAS  THEREUP  CALLED  AS  A  WITNESS  HEREIN,  AND

10      AFTER  HAVING  BEEN  FIRST  DULY  SWORN  TO  TELL

11      THE  TRUTH  AT  10:38  A.M.,  WAS  EXAMINED  AND

12      TESTIFIED AS FOLLOWS:

13      **DIRECT EXAMINAITON**

14   **BY MS. MATHEWS:**

15   Q    Good morning, sir.

16   A    Good morning.

17   Q    Thank you.

18       I'm  going  to  be  asking  you  a  series  of

19   questions.

20   A    Okay.

21   Q    If  you  don't  understand  me,  stop  an  ask  me.  You also

22   have  to  answer  orally.  You have to say something in response

23   to  the  questions  because  the  gentleman  standing  or  sitting

24   in  front  of  you  is  taking  down  everything  that  you  say.

25   Do you understand?

BDC

1    A    Yes, ma'am.

2    Q    Sir, would you state your name for the record.

3    A    Gordon Johnson.

4    Q    Mr. Johnson, I'm going to take you back to January

5   27, 2015, at approximately 12:30 a.m., did you happen to

6   be in the location of 10100 East Warren?

7    A    Yes, ma'am.

8    Q    And what's at, is that in the City of Detroit?

9    A    Yes.

10   Q    The County of Wayne?

11   A    Yes.

12   Q    What's at that location?

13   A    A Velero gas station.

14   Q    And what were you doing there?

15   A    Working up there.

16   Q    When you say working, what type of work were you doing?

17   A    Like cleaning up, make sure ain't nobody really stealing

18   out of the store or nothing. Probably pay me a couple

19   dollars and give me something to eat.

20   Q    So, sir, did you receive a pay check for this type

21   of thing?

22   A    No. Cash.

23   Q    Okay. You did it kind of under the table?

24   A    Yeah.

25   Q    Now at that time and date was there anybody, any other

1  employees up there with you?

2  A     Just the guy behind the counter.

3  Q     Do you recall what his name is?

4  A     I'm not for sure, because that's the other guy just
5  change the shift.  I don't know his correct name.

6  Q     Okay.

7  A     Mohammed.  I'm not for sure.  I'm not for sure his
8  correct name.

9  Q     Okay.  Fair enough.  Were you inside the station?

10  A     Yes.

11  Q     Were the doors locked, at that time?

12  A     No, it wasn't.

13  Q     No.  Did anyone come in?

14  A     Yes.  Two guys came in.  But then after those two guys
15  came in they were still at the, getting some stuff out the
16  store.  And another two, another one guy came in.  He was
17  purchasing something.  That guy left out.  Then another
18  guy came in.  After that time --

19  Q     All right.  Let's back up for a second.

20  A     Okay.

21  Q     So business as usual.  People are coming in and going
22  in the store?

23  A     Yes.

24  Q     Did something unusual happen with any of the customers
25  that were in that store?

BDC                            11

1  A    Yes.

2  Q    What was that?

3  A    Once I'm locking up after the customer leave out.
4  Put a gun to my side.

5  Q    You felt a gun to your side?

6  A    Yes.

7  Q    Okay, now let's back up.  Do you see that person that
8  put the gun to your side in the courtroom today?

9  A    Yes, ma'am.

10  Q   Can you point him out and describe what he is wearing?

11  A    This guy right here in the black with --

12             MS. MATHEWS:  Your Honor, I'd ask that the
13  record reflect that Mr. Johnson has identified Mr.
14  Thomas-Dawson.

15             THE COURT:  So noted.

16  Q    Now, what was Mr. Thomas-Dawson wearing at the time
17  that you saw him?

18  A    He was wearing a yellow shirt, like a turtleneck, long
19  sleeve.

20  Q    And you indicated that he came, he approached you?

21  A    Yes.

22  Q    And did have anything, did you see anything in his
23  hands?

24  A    Yes, I seen, once I looked down, I seen the gun was
25  on my side.  I was being escorted out the door.

BDC

1  Q     When you say, you were escorted out the door, where
2  are you standing when he first approaches you?

3  A     I was at the door. I was getting ready to lock up.
4  I let the last person out.

5  Q     Does he say anything? How do you know to go out if
6  he didn't --

7  A     He told me to walk out.

8  Q     To walk out?

9  A     Yes.

10  Q     When Mr. Thomas-Dawson first came in to the gas station,
11  was he by himself?

12  A     He was by hisself. The other guy came in before him.
13  Then that person left out.

14  Q     What did that person have on, if you recall?

15  A     The other person?

16  Q     Yes.

17  A     He had a lot of tattoos.

18  Q     Now you're walking out, outside with Mr. Thomas-Dawson,
19  how far did you get?

20  A     To the vehicle they was at.

21  Q     Where was that vehicle parked, if you recall?

22  A     At one of the pumps.

23  Q     How many pumps are at that store?

24  A     Well on that side it's only like two pumps towards
25  the door. He was at the second one. The car, the vehicle

BDC

1   was at the second pump.

2   Q    When you say two pumps by the door, are you talking

3   about the first island of pumps?

4   A    Yes, the first island.

5   Q    And would that be the, would that be the pumps closest

6   to the door?

7   A    Yes.

8   Q    Now, do you say anything while you're walking out?

9   A    No.

10   Q    Does he say anything, referring to Mr. Thomas-Dawson?

11   A    After they hit me with the gun, they asked me where

12   is it at?

13   Q    Wait a second.  Who's they?  Because at this point

14   you still only have Mr. Thomas-Dawson with you is that

15   correct?

16   A    No, he walked me to the other guy.

17   Q    And where is the other guy?

18   A    They're at the side door of the vehicle.

19   Q    What type of a vehicle was that?

20   A    It was a dark colored two door car.

21   Q    Did you notice anything unusual about that vehicle?

22   A    One of the windows was busted.  Had the plastic on

23   it.

24   Q    When he walks you to that side of the vehicle, you

25   indicate that another man comes out?

BDC

14

1  A     The other man was already there at the vehicle waiting
2  on him.

3  Q     What happens at that point?

4  A     They get to hitting me with the gun and other guy hit
5  me in my face.

6  Q     All right.  Let's back up again.  You said, they hit
7  you with the gun?

8  A     Uh-huh.

9  Q     Who hit you with the gun?

10 A     Right here.  The person right here.

11 Q     Mr. Thomas-Dawson?

12 A     Yes.

13 Q     And where on  your body does he hit you with that gun?

14 A     In my face.

15 Q     How many times does he hit you?

16 A     Oh, man.  Quite a few times.

17 Q     What is  the other man doing, while he's hitting you
18 with the gun?

19 A     He's hitting me with his fist.

20 Q     Are they saying anything to you?

21 A     At that time they were grabbing the items that I had
22 on me.

23 Q     What items would that be, sir?

24 A     I had like 20/30 dollars.  And I had like some weed
25 on me.

BDC

15

1  Q    Okay.  Any clothing?

2  A    Yeah, I had a True Religion coat.

3  Q    What exactly did they take from you?

4  A    I know they took my money.  And the rest of the things

5  was probably on the ground like my teeth and stuff.

6  Q    How about your coat?  Did they take the coat?

7                 MS. DIALLO:  Objection.  Leading.

8  A    Yes, the took my coat.

9                 THE COURT:  Sustained.

10                MS.  MATHEWS:  Well,  Your  Honor,  actually

11  I think he indicated early that he had taken, they had taken

12  his True Religion coat.  I was just clarifying that.

13  Q    What else in addition --

14                THE  COURT:  No  you  didn't.  You  asked  him

15  what  did  he  have.  He  said,  20  had  30  dollars,  some  weed.

16  You  said  somethimg  about  his  coat.  That's  when  he  said,

17  the  True  Religion  coat.  He  didn't  say  anything  about  it

18  being taken.

19                MS. MATHEWS:  Thank you.

20  Q    In  addition  to  the  20  or  30  dollars  that  was  taken

21  from you, was anything else taken?

22  A    Yes.  My True Religion coat.

23  Q    Thank you.

24                After  your  True  Religion  coat  and  the  money

25  is taken from you, what happens then?

BDC

1  A     One guy, he went back in the store.  And the person
2  right here, he --

3  Q     Are you referring to Mr. Thomas-Dawson?

4  A     Yes, Mr. Dawson.  He had the gun on me,  and while
5  the other guy in the store I swung, ran.  After that time,
6  he start shooting the gun towards me.  Shooting the gun
7  at me where I was running to.  I was running like running
8  crossing on the other side of Warren.

9  Q     And he starts, how many shots were, how do you know
10 first of all that it was Mr. Thomas-Dawson?

11 A     I was looking at him.  I was looking where I was
12 running.  I was looking back to check see if I was shot.
13 He was pointing it at me.  He didn't hit me or nothing
14 though.  I was checking to see if I was hit.

15 Q     When you indicate that you're looking to him, how does
16 that work?  You're running across the street and --

17 A     Yes, but I'm looking back.

18 Q     And what was the lighting like in that area?

19 A     It was nighttime.  It was still lights, the lights
20 up at the gas station and the street lights on.

21 Q     So you didn't have any problems viewing him?

22 A     No.  No problem.

23             MS. MATHEWS:  May I approach, Your Honor?

24             THE COURT:  You may.

25 Q     I have a clear understanding of where you were, when

BDC

17

1  all this went down, I'm going to hand you some documents

2  that as demonstrative evidence. First see if you recognize

3  this?

4  A    Yes.

5             THE COURT: Miss Mathews, are they marked?

6             MS. MATHEWS: Not yet. They haven't been

7  marked.

8             THE COURT: Can you mark them for the record,

9  please.

10            MS. MATHEWS: Yes, I will. Your Honor, may

11  I have them colletively marked? Or do you want me to mark

12  each individual one?

13            THE COURT: Each individual one. So we have

14  a clean record.

15            MS. MATHEWS: Thank you.

16            (People's exhibits one thru twelve marked)

17  Q    Mr. Johnson, I'm handing you what has been previously

18  marked as People's proposed exhibit number four.

19  A    Uh-huh.

20  Q    Can you identify that?

21  A    Yes, that's the door at the store.

22  Q    So that is the gas station?

23  A    Yes, that's the exit door.

24  Q    People's proposed exhibit number one.

25  A    Yes, that's the counter.

BDC

1  Q    You have to speak up.

2  A    The counter.

3  Q    And this is all in the gas station?

4  A    yeds.

5  Q    Where were you, sir?

6  A    When it first started, I was right here on the side.

7  Q    By the chip display?

8  A    No.  By the coffee machine.

9  Q    By the coffee machine?

10 A    Yeah.

11 Q    Where were you when Mr. Thomas-Dawson apporached you?

12 A    I was at the door.  I was at the door letting 'em out.

13 Exiting out this door, the gun was on my side.  Told me,

14 excorted me out.

15 Q    When the gun was on your side, did, were you able to

16 see it?

17 A    Yeah, I looked down at it.

18 Q    Okay.  Once you left that area -- People's proposed

19 exhibit number 12, this is the diagram of the store.  This

20 was the front of the store.

21 A    Uh-huh.

22 Q    Where did you end up?

23 A    Right here.  (Demonstrating)

24 Q    So that would be in front of pump number two?

25 A    Yeah.

BDC

1   Q    And is that, where was the vehicle parked?

2   A    It was parked where pump one.  I was at the passenger's

3   door of the vehicle.

4   Q    Was the vehicle pointed towards --

5   A    It was pointed towards this way, like it was going

6   towards this way. (Demonstrating)

7   Q    So it would have been pointed away from Cadillic,

8   correct?

9   A    Yes.

10  Q    The passenger's, what side of the vehicle was closest

11  to the store?

12  A    The passenger's s side.

13  Q    Again, wha type of vehicle was that?

14  A    It was a dark color car, two door.  One of them had

15  plastic over the window.

16  Q    Which one was that?  Which window, if you recall?

17  A    It was towards the back.

18  Q    Okay.  The back passenger?

19  A    Yes.

20               MS. DIALLO:  Your Honor, objection as to

21  leading.

22               MS. MATHEWS:  I'm sorry.

23               THE COURT:  Objection sustained.

24  Q    Did you ever go around the vehicle?

25  A    No.


BDC

1  Q    All right.  So the only view of the vehicle that you
2  have, was which view?

3  A    The passenger's side.

4  Q    I'm handing you People's proposed exhibit number
5  two.

6  A    Uh-huh.

7  Q    Do you, can you identify that?

8  A    Yes.  This is how it looks afterwards.

9  Q    Well, is the  --

10              THE COURT:  How what looked?

11  Q    Is that -- I'm sorry.

12              THE COURT:  How what looked?

13              THE WITNESS:  This is how it looked afterwards
14  when the vehicle was not there.

15  Q    Can you identify what that picture is?  Do you recognize
16  that area?

17  A    Yeah.

18  Q    What is that?

19  A    Warren and Cadillac, the Valero Gas station where it
20  happened.  That was pump one,  and more than likely on the
21  ground where they have the --

22  Q    Okay.  Don't speculate.

23  A    Okay.

24  Q    So that's pump one?

25  A    Yeah.

BDC                              21

1  Q     Is that near the area where you indicate this happened?

2  A     Yes.

3  Q     What direction is this looking from?  Where would the
4  front door be from here?

5  A     The front door would be right here.  It's  like further
6  up.  (Demonstrating)

7  Q     Okay.  So how far from the front door of the gas station
8  is pump one?

9  A     I can't tell you exactly how many feet it is, but this
10 is, it's like coming in an angle.

11 Q     I'm handing you now People's proposed exhibit number
12 three.

13 A     Uh-huh.

14 Q     Can you tell where that is from?

15 A     Yeah, this is pump one.  It was right here.  This is
16 where the vehicle was at.

17 Q     Where would that be looking out from?

18 A     This is looking out from the door.

19 Q     Of this, of the gas station?

20 A     Yeah.

21               MS. MATHEWS:  The People would move to admit
22 these exhibits, Your Honor.

23               MS. DIALLO:  What are the numbers?

24               THE COURT:  Exhibits four, one, twelve, two
25 and three?  Is that you're moving to admit, Miss Mathews?

BDC                           22

1      MS. MATHEWS: And two.

2      THE COURT: Four, one, twelve, two and three.

3      MS. MATHEWS: Thank you.

4      MS. DIALLO: Is that is?

5      THE COURT: Any objection?

6      MS. DIALLO: No. No objection to those

7 exhibits.

8      THE COURT: All right. People's four, one,

9      twelve, two and three are admitted.

10      (People's exhibits four, one, twelve, two

11      and three admitted)

12      MS. MATHEWS: May I approach, Your Honor.

13      THE COURT: You can hold on to them until

14 the end.

15      MS. MATHEWS: Okay.

16 Q You indicate that after the, after you heard shots

17 you ran, correct?

18 A No. I was running and then shots was fired at me.

19 Q Okay. Thank you. And what direction were you running

20 towards?

21 A Towards, it was coming out towards from Cadillac to

22 Warren. I was like running in an angle.

23 Q Referring back, Mr. Johnson, to exhibit 12, People's

24 exhibit number 12, if you take this green marker, can you

25 show us the direction that you ran from where you started

BDC       23

1    to where you ended up?

2                    Now this indicates from the side of pump

3    number two?

4    A    Uh-huh.

5    Q    Is that correct?

6    A    Uh-huh.

7    Q    Is that a yes?

8    A    Yes, ma'am.

9    Q    After you ran, what happened after that?

10   A    At that moment, I ran over to the other one, other

11   gas station and I look out, I try to see if they was, if

12   I can get any help at the moment. Already the police was

13   on their way over there.

14   Q    How do you know the police were on their way over

15   there?

16   A    Because when I looked back over there I seen the police

17   cars there. That's when I came back towards that area.

18   Q    So you come back to the gas, the Valero?

19   A    Yeah.

20   Q    When you were at the Valero, did, were photographs

21   taken of you?

22   A    Yes.

23   Q    I'm showing you Peopl'e proposed exhibit 8, 9, 10 and

24   11. Do you recognize these?

25   A    Yes, ma'am.

1  Q    Can you go through them?    Is this how, a true and
2  accurate representation of your injuries at the time of
3  the incident?

4  A    Yes.

5  Q    Excuse me?

6  A    Yes, ma'am.

7  Q    And the exhibits 9 and 10, 8 and 9, what are those
8  depict?   What are those pictures of?

9  A    My mouth, my teeth was being out.  Afterwards my teeth
10 was knocked out.

11 Q    Pictures 9 and 10, or 10 and 11?

12 A    Scars from my face.  How the injury was.

13 Q    Is your face bruised at all?  Or was your face bruised
14 at all?

15 A    Yes.

16 Q    Where abouts on your face?

17 A    Over my eye and under my face.  Around my mouth and
18 other side of my face.

19 Q    Thank you.

20                  Did you make a report at that time to the
21 officers?

22 A    Yes.

23 Q    Did you make a written statement at that time?

24 A    At that time, officers took statements from me.

25 Q    But you didn't write anything out?

1   A     No.

2   Q     Okay.  Did you have an occasion, sir to go the Detroit

3   Detention Center the next day, that being the 28th?

4   A     Yes.

5   Q     At that time, did you view a live lineup?

6   A     Yes, ma'am.

7   Q     Prior to viewing that lineup, did you speak to some

8   officers?

9   A     No.

10  Q     Did anyone escort you back to the lineup area?

11  A     Yes.  Yes, ma'am.

12  Q     Were those police officers?

13  A     Yes.

14  Q     Did any of those officers, did officers remain in the

15  room with you while you looked at the live lineup?

16  A     Yes, officer stayed in the room.

17  Q     And did any of those officers throughout that period

18  indicate to you by work or gesture whom to pick?

19  A     No.

20  Q     Were you able to pick someone?

21  A     Yes.

22  Q     Do you recall who it is was?  Did you see --

23  A     Yes, I see one of them here.  One of the defendants

24  here.

25  Q     And whom did you -- I'm handing you People's proposed

BDC                            26

1  exhibit number six, is this the picture of the lineup you

2  viewed?

3  A    Yes, ma'am.  This is one of the lineups.

4  Q    Is that the lineup you viewed?

5  A    Yes, ma'am.

6  Q    And who did you pick out of that lineup?

7  A    The person right here in the yellow shirt..

8  Q    And who is that?

9  A    I see him in the courtroom today.  It's him right here.

10                MS. MATHEWS:  Your Honor, I ask that the

11  record reflect that Mr. Johnson identified Mr. Thomas-Dawson

12  is the person who was picked out of the lineup.

13                THE COURT:  So noted.

14                MS. MATHEWS:  I move to admit the picture

15  of the lineup.

16                THE COURT:  People's proposed exhibit six.

17  Any objection?

18                MS. DIALLO:  No objection.

19                THE COURT:  People's six is admitted.

20                (People's exhibit six admitted)

21                MS. MATHEWS:  Thank you, Your Honor.

22  Q    After you reviewed that lineup Mr. Johnson, did you

23  sign a document?

24  A    Yes.

25  Q    I'm handing you proposed, People's proposed exhibit

BDC                              27

1  number seven, can you identify that?

2  A    Yes, this is my signature right here on number two.

3  Q    Did you sign underneath that sentence?

4  A    Yes, I did.

5  Q    What does that sentence say?

6  A    I didn't have my name on there.

7  Q    Can you read what it says above that?

8  A    No, I really can't.  You have to go through it.

9  Q    Okay.  Sir, do you have difficulty reading?

10 A    Yes, ma'am.

11 Q    When you signed your name underneath this, did somebody

12 read the questions for you?

13 A    Yes, ma'am.  They did.

14 Q    And the answers?

15 A    Uh-huh.

16 Q    But that's your signature?

17 A    Yes, ma'am.

18 Q    Did you also circle number two?

19 A    Yes.

20 Q    Are those your initials?

21 A    Yes, it is.

22 Q    Do you recall what you said to them -- the officers?

23 A    Through the whole statement of it?    What is the

24 question?

25 A    Underneath here, do you recall being asked, where you

1  recognize number two.

2  A    Oh, yes.

3  Q    What did you indicate as your answer? If you recall.

4  A    I mean that was the defendant that's here in the

5  courtroom right now. He had the yellow shirt on with the

6  hair.

7              MS. MATHEWS:  Your Honor, the People would

8  ask to admit People's exhibit number seven.

9              THE COURT:  Any objections?

10             MS. DIALLO:  No, objection, Your Honor.

11             THE COURT:  People's seven is admitted.

12             (People's seven admitted)

13 Q    Sir, did you come and testify at the preliminary

14 examination?

15 A    Say that again?

16 Q    Did you come in court before and testify?

17 A    Yes, ma'am.

18 Q    Or after that?

19 A    Yes, ma'am.

20 Q    Strike that. After you looked at the live lineup,

21 did you give a written statement to the officers?

22 A    Yes. The officers took a statement from me.

23 Q    All right. But you've indicated that you have a hard

24 time reading?

25 A    Uh-huh.

BDC                        29

1  Q   Do you also have a hard time writing, Mr. Johnson?

2  A   Yeah, at the  moment.

3  Q   So you, how did that come about that statement was

4  given?

5  A   The officer took my statement on the situation because

6  I told him what my disability was.

7  Q   Okay.  Then they wrote it down?

8  A   Yes.

9  Q   Did you sign it, if you recall?

10  A   Yes, ma'am.

11  Q   All right.  After it was read over to you?

12  A   Yes.

13  Q   Because you didn't read it over yourself?

14  A   No.

15  Q   Thank you.

16         MS. MATHEWS:  One second, Your Honor.

17  Q   How did you feel when this was happening?

18  A   When did it, can you repeat the question?

19  Q   Yes.  Thank you.  When you were being struck by the

20  defendant about the face, loosing teeth, how did you feel?

21  A   I felt helpless.

22  Q   When you were running away from the gas station, shots

23  were being fired after you, how did you feel?

24  A   Like I was about to die.  I was trying to get away.

25  Q   Did you ever give permission to Mr. Thomas-Dawson or

1  his associate, Mr. Brown, to take your items from you?

2  A    No.

3  Q    And would you have given them had the weapon not been

4  present?

5  A    Can you repeat that?

6  Q    Strike that.

7                   MS. MATHEWS:  Thank you.  I have no further

8  questions.

9                   THE COURT:  Miss Mathews, are you moving

10  to admit People's exhibits eight thru eleven?

11                   MS. MATHEWS:  We are, Your Honor.

12                   THE COURT:  Any objection?

13                   MS. DIALLO:  Judge, I believe -- hold on

14  one second.  Those would be the pictures of the complaining

15  witness testifying.

16                   THE COURT:  That's correct.

17                   MS. DIALLO:  No objection.

18                   THE COURT:  All right.  People's eight thru

19  eleven are admitted.

20                   (People's exhibits eight thru eleven admitted)

21                   MS. MATHEWS:  Thank you.  Actually eight

22  is the -- Thank you.

23                   THE COURT:  Miss Diallo, do you mind if we

24  take a brief break.  We have a number of attorneys in the

25  courtroom.

BDC                              31

1          MS. DIALLO:  No.  That is fine, Judge.

2          THE COURT:  Mr. Johnson, if you could, please

3    step in the witness room.

4          (The witness was excused at 11:06)

5

6          (The  Court  took  a  brief  recess  for  other

7          court matters at 11:06)

8

9          (The case was recalled at 11:31)

10         THE COURT:  Back on the record.  Appearances.

11         MS. MATHEWS:  Megan Mathews for the People.

12         MS.  DIALLO:  Once  again,  Lillian  Diallo  on

13   behalf  of  Donnie  Thomas-Dawson,  who  is  present  in  front

14   of me.

15         THE  COURT:  Mr.  Johnson,  I  have  to  remind

16   you that you're still under oath, okay?

17         THE WITNESS:  Yes, ma'am.

18         THE  COURT:  Whenever  you  are  ready,  Miss

19   Diallo.

20         (Mr. Johnson resumed testigying at 11:32)

21         **CROSS EXAMINATION**

22   **BY MS. DIALLO:**

23   Q    Good morning, Mr. Johnson.

24   A    Good morning.

25   Q    I'm going to ask you a few questions.  If you don't

1 understand something I said, please let me know and I'll
2 do my best to clear it up, okay?
3 A    Okay. Thank you.
4 Q    Thank you.
5              Now it's true that Mr. Thomas-Dawson did
6 not take any money from you, correct?
7 A    No.
8 Q    He did not, right?
9 A    No, he didn't.
10 Q    Okay. And then as far as this car is concerned, you
11 didn't really know what this car looked like back earlier
12 in time whenever the preliminary exam was held? Hold on
13 one second.
14              MS. DIALLO: Can I see what date of the
15 preliminarye exam?
16 Q    You remember a preliminary exam being held in this
17 matter February 23, 2015?
18 A    Yes, ma'am.
19 Q    Okay. All right. During that exam, you couldn't
20 remember anything specific about that vehicle that you
21 testified to here today, correct?
22 A    Yes, I did.
23 Q    Okay. Page 16, I'm going to read to you a question
24 and an answer, okay?
25 A    Okay.

1  Q    Rll right. I'm going to start at line 18.

2  A    Uh-huh.

3            QUESTION: DID YOU SEE WHERE THESE TWO MEN

4            WERE -- THE DEFENDANTS?

5            YOUR RRESPONSE: BY THE TIME THEY HOPPED

6            IN THE VEHICLE AND PULLED OFF?

7            QUESTION: OKAY. WHAT KIND OF VEHICLE WAS

8            IT, IF YOU KNOW?

9            ANSWER: IT WAS A DARK GREEN TWO-DOOR, SAY,

10           MONTE CARLO OR --

11           QUESTION: OKAY. ALL RIGHT. ANYTHING

12           SPECIFIC ABOUT THAT CAR THAT WILL STRIKE

13           YOUR MEMORY -- THE CONDITION OF IT?

14           YOUR RESPONSE: I DON'T KNOW.

15  Q   Remember those questions and those answers, sir?

16  A   Yes, ma'am.

17  Q   Okay. So at the time, at the prelimiary exam was held,

18  you didn't remember anything remarkable about the vehicle

19  itself, correct?

20  A   Right. Didn't mention that part when he asked.

21  Q   You didn't describe any busted out windows, correct?

22  A   No, didn't say that at the moment.

23  Q   Okay. Thank you. Is it fair to say, I'm not making

24  light of it. I'm apologizing for anything that happened

25  to you that day.

BDC                          34

1   A     Uh-huh.

2   Q     But is it fair to say that this all happened relatively

3   quickly?

4   A     Yes, it did.

5                    (Defense exhibits A thru F marked)

6   Q     Okay.  I'm going to approach you with what's been marked

7   as defense exhibit A, B, C, D, E, F.

8   A     Okay.

9   Q     Have you seen those before, sir?  That area?  Is that

10  the gas station where you were that night?

11  A     Yes, it is.

12  Q     Okay.  Are you depicited in one of those pictures,

13  sir?  At least one.

14  A     Say that again.  What's the question.

15  Q     Are you in any of the pictures?

16  A     Yes.

17  Q     Is that you, the back of your head?

18  A     Yes.

19  Q     That's the front of you?

20  A     Yes, that's the front of me.

21  Q     Okay.  Let me see -- and the rest are being, when,

22  accurately depict the gas station as it appeared on that

23  particular evening?

24  A     Yes.  Uh-huh.

25                    MS. DIALLO:  Your Honor, at this time, I'd

BDC                              35

1 move for defense exhibit A, B, C, D, E and F.

2             THE COURT: Any objection?

3             MS. MATHEWS: None, Your Honor.

4             THE COURT: All right, defense exhibits,
5 A thru F are admitted.

6             (Defense exhibits A thru F admitted)

7 Q    Okay. Sir, I'm going to show you now what's been
8 admitted as Defense exhibit A, is this where the car was
9 located that you said that you saw where the passenger door
10 was facing the front door of the gas station?

11 A    Repeat that one more time.

12 Q    Is this the pump where you go, where the car was parked
13 at?

14 A    Yes.

15 Q    Okay. And that car that was parked at that pump, the
16 passenger door was facing the gas station, correct?

17 A    Yes.

18 Q    There are lots of cameras around that location, correct,
19 sir?

20 A    I know the gas station do have cameras.

21 Q    Okay. Did you ever see this incident caught on camera?

22 A    Did I ever watch a tape?

23 Q    Right, did you ever watch a tape?

24 A    No, I never sat and watched a tape.

25 Q    Okay. When you got your, I guess your teeth knocked

1   out, it was a lot of blood, correct?  Was there blood?

2   A   On the ground or on me?

3   Q   On you?

4   A   Yeah, I mean I had blood on me.

5   Q   Okay.

6   A   I figured out, it is blood on me.

7   Q   I'm sorry?

8   A   Yes, I've -- yes, it was blood on me.

9   Q   Was it on your, where on your person would it have
10  been?

11  A   Guess around my mouth, probably by my face.

12  Q   Okay.

13  A   I mean, it's open wounds.

14  Q   Okay.

15  A   So I figured, yes.

16  Q   Okay.  Thank you.

17          And it's fair to say that the person that
18  you've identified in this courtroom, you had never seen
19  him before that particular day or evening, correct?

20  A   Never saw him.

21  Q   Is that -- you have to speak up.

22  A   No, ma'am.

23  Q   Okay.  Thank you.  Did you ever describe the person
24  as wearing a tan shirt, sir?

25  A   You said, do the person, did he have a tan shirt on?

BDC                          37

1   Q    At the time, correct.  Can I see your --

2   A    It was yellow.

3   Q    It was yellow.  Okay.  Just one second.  I just want

4   to see the admitted exhibits.

5                You indicated that, when the shooting started

6   you were running away from this gas station, correct?

7   A    Yes, ma'am.

8   Q    As a matter of fact, weren't you on the curb by the

9   time the shooting started of the gas station?

10  A    No, I wasn't on the curb.

11  Q    Okay.  When you, maybe, when you got to the curb is

12  that when you turned around and looked back?

13  A    No.  I was looking back at the moment.

14  Q    Page 29, preliminary exam transcript, remember the

15  following questions being asked and the responses being

16  given by you under oath?  I'm going to start at  line 17:

17               QUESTION:  WHEN THEY, DID THEY MEAN MORE

18               THAN ONE PERSON

19               YOUR RESPONSE?  ONE PERSON SHOOTING.

20               QUESTION:  OKAY.  YOU KNOW BECAUSE YOU'RE

21               RUNNING AND LOOKING BACK?

22               YOUR RESPONSE:  Yeah, once I got there I

23               LOOKED BACK.  I WAS LOOKING.

24               QUESTION:  ONCE YOU GOT WHERE?

25               RESPONSE:  SAY IT, LIKE THE CURB.  I STARTED

BDC                              38

1                LOOKING.

2                QUESTION: HOW FAR IS THE CUBR AWAY FROM

3                THERE? IN THIS ROOM, POINT TO SOMETHING

4                IN THIS ROOM.

5                ANSWER: PROBABLY FROM MAYBE THE DESK TO

6                MAYBE THAT WALL.

7   Q    Remember those questions and those answers, sir?

8   A    Yes.

9   Q    Okay. So you were kind of a good distance away when

10  you turned around to see who or what was shooting at you,

11  correct?

12  A    Yes. But that was still in the running process.

13  Q    I know. I appreciate that. Thank you.

14               As a matter of fact once the shooting started

15  that's when you started looking back, correct?

16  A    I was running still. Like it was already in the

17  process, running, looking back at the same time, turned

18  around see if you, check to see if you got shot. It was

19  all like in a short period of time.

20  Q    Yes, sir. Okay.

21               Page 31, line 3 thru 11.

22               QUESTION -- I'm sorry line one.

23               YOU JUST STAND THERE AND LOOK AT HIM. IS

24               THE SHOOTING STILL GOING ON?

25               YOUR RESPONSE: THE SHOOTING STARTED ONCE

1          I STARTED LOOKING BACK. YEAH, THE SHOOTING
2     STARTED.
3          QUESTION: OH, I SEE. SO YOU.
4     THE RESPONSE: YEAH.
5          QUESTION: SO YOU'RE NOT GETTING SHOT AT
6     UNTIL YOU'RE 30 FEET AWAY?
7          YOUR RESPONSE: YEAH. UNTIL I GOT--
8          QUESTION: OH, I SEE. I SEE. I SEE. SO
9     YOU'RE -- AND YOU SAID GETTING SHOT AT.
10    YOU HEARD SHOTS WHEN YOU WERE 30 FEET AWAY?
11          NO. I HEAR SHOT. I'M LOOKING AT HIM SEEING
12    HIM SHOOT AT ME.
13 Q   Remember those questions and answers?
14 A   Yes, ma'am.
15 Q   Were those true then, sir?
16 A   True.
17 Q   Is that a yes?
18 A   Yes, ma'am.
19 Q   Okay. Thank you.
20          Now today when you testified on the stand
21 you indicated that marijuana was taken from you, correct?
22 A   No. I said --
23 Q   Is that marijuana, weed marijuana? Did you say
24 marijuana or weed?
25 A   I didn't say it was taken from me. I said, the

BDC
                          40

1   marijuana was down. I said money was taken from me. I

2   said my things was on like, after the crime, like, my teeth

3   was out.

4   Q    Uh-huh.

5   A    My possessions, two possessions was on the ground that

6   I had in my pocket. Money was taken and my coat was taken

7   from me.

8   Q    Okay. You never said there was any marijuana taken

9   from you?

10  A    Yeah, it was in my pocket. The things was in my

11  possession in my jacket.

12  Q    Okay.

13  A    Some things was on the ground.

14  Q    Okay. That's fine. Is it fair to say you never told

15  the police that you had marijuana on or about your person

16  at the time you were, you came across these people, correct?

17  A    It was a part of my possessions that I had.

18  Q    My question is a little different, sir. Did you tell

19  the police specifically that they took, that marijuana was

20  taken from you?

21  A    No. I didn't, I didn't, they didn't take, indicate

22  it was taken from me because I don't know if it was -- I

23  know my money was taken from me. I know my coat was taken

24  from me.

25  Q    Yes, sir.

1    A    I knew marijuana was on the ground. This is like,
2    this was a drug that I use and had.

3    Q    Were you using the drugs that night?

4    A    Yes.

5    Q    Okay. How close to the time of the incident were you
6    using the marijuana?

7    A    Probably like in the morning time. You know, I smoke
8    like out the day. You know, a few times.

9    Q    Oh, you just -- you're a smoker, huh?

10   A    Yeah.

11   Q    It's okay. So that we're clear, the door to this
12   location was not locked -- people were coming in and out,

13   A    Yes.

14   Q    Is that. Okay. Is it fair to say that more than one
15   vehicle that was around the gas station that particular
16   evening?

17   A    No.

18   Q    There was only one car?

19   A    It was other vehicles but not by that pump. No. It
20   was like, the owner have a vehicle. The person that was
21   working at the store, so he do have a vehicle.

22   Q    Yes, sir. Just one second.

23              MS. DIALLO: Can I see the lineup sheets?
24   Is it fair to say, sir, that there is only one person --
25              MS. DIALLO: Permission to approach?

1                THE COURT:  You may.

2   Q   I'm  going to show you what's been marked and admitted

3   as People's six, that's the lineup sheet you got, the lineup

4   you got to view, correct?

5   A   Yes, ma'am.

6   Q   There is only one person in that lineup with a canary

7   yellow shirt on, correct?

8   A   With a yellow shirt on, yes.

9   Q   And that would be the person who you picked out that's

10   sitting in front of us, correct?

11   A   Yes, ma'am.

12   Q   Okay.  And that yellow shirt stuck out in your mind,

13   did  it not?

14   A   Both the face and the shirt.

15   Q   I know.  But the yellow shirt was a dead give away,

16   wasn't it?

17   A   Yeah.

18   Q   Okay.

19           MS. DIALLO:  Just one second, Judge.

20           THE COURT:  Take your time.

21   Q   The  statement that you gave the police, even though

22   you might not have written it, but they read it to you and

23   you signed it, correct?

24   A   Okay.

25   Q   Is that yes?

BDC                  43

1  A    Yes, ma'am.

2  Q    Okay. Did they give you an opportunity to change

3  anything in there that you wanted to change?

4  A    Yes.

5  Q    Is it true that you did not see the vehicle that the

6  people pulled up in, is that fair to say?

7  A    You say I didn't see them --

8  Q    You don't know how they arrived, the people that you

9  saw? You don't know how they arrived?

10 A    No. How they arrived in the beginning, no.

11 Q    Thank you.

12          You got there around nine o'clock that

13 particular evening, correct? Or a little after nine?

14 A    I'm not for sure of the exact time that I started

15 working there at that day.

16 Q    Yes.

17 A    But --

18 Q    If I try to refresh your --

19 A    Okay.

20 Q    -- recollection with something? Do you remember

21 testifying previously that you get to work around nine

22 o'clock p.m.? Page 34. Around nine o'clock p.m.? But

23 you were a little late that day.

24 A    Yeah, it says, I -- but the other guy be there. It's

25 two shifts. Three shifts really.

BDC                        44

1    Q    Okay.

2    A    And the second guy, the first guy come in and then

3    the second shift.   And then there's a shift of people.

4    So between the time period that the second shift guy, I

5    was there.

6    Q    Okay.   Do you know what time that might have been,

7    sir, Mr. Johnson?

8    A    I can't say that exact time at the moment.

9    Q    Okay.   Isn't it true sir, that you weren't really

10   looking at the cars?   You were looking at the people,

11   correct?

12   A    Once that happened, I mean, I seen the vehicle.   I

13   was there at the vehicle.

14   Q    Okay.   I understand that.   But you were paying attention

15   to the people as opposed to the vehicle, correct?

16   A    I was paying attention to everything at the moment.

17   Q    Everything.   Okay.   And you're quite certain that the

18   passenger door was to the front door of the gas station,

19   correct -- of the car?

20   A    Yes.

21   Q    And that's right there in that light, correct?

22   A    Yes, ma'am.

23   Q    And with that light, you would be able to see if there

24   was a busted out window in that passenger side, correct?

25   A    Right.

BDC                                  45

1    Q    You never said you saw that though, did you?

2    A    I didn't say that in the first statement.  No I didn't.

3    Q    Okay.  Or at the preliminary exam?

4    A    Repeat that.  No, I didn't.

5    Q    Okay.  Just a second.  Just so we are clear, this wa

6    not a dispute over weed, was it?

7    A    No.

8    Q    What did you say?

9    A    No, ma'am.

10   Q    Did you say, huh?

11   A    I said, no.

12   Q    Oh, I'm sorry.  Okay.  It was not a dispute over

13   marijuana?

14   A    No, ma'am.

15   Q    Okay.  But there was marijuana that was part of

16   everything that you say got taken from you, correct?

17   A    Yes.

18   Q    Is that a yes?

19   A    I'm not for sure what they -- I knew I had, my money

20   got taken.  I knew what was in my poss -- pocket, came out.

21   Q    Yes, sir.

22   A    I knew my coat was gone and my money was in my pocket.

23   Somethings was on the ground.  I know my teeth was on the

24   ground.  I know it was some weed on the ground.

25   Q    Oh, was it?

BDC                              46

1   A      Yes, ma'am.

2   Q      Okay.  We're clear --

3   A      My coat, my coat was gone too.

4   Q      Hold on.  Hold on.

5   A      Okay.  I apologize.

6   Q      Your coat was gone too?  Anything else?

7   A      No.

8   Q      Because you wouldn't forget something like this that

9   happened, correct -- and what was taken from you, right?

10  A      Yeah --

11  Q      Say that again.  You wouldn't forget that, correct?

12  A      You said, I wouldn't forget what was taken from me?

13  Q      Correct.

14  A      I know my money and my coat was gone.

15  Q      Okay.

16  A      My teeth was out.

17  Q      I know.  I understand.

18  A      That's the main things I remember.

19  Q      And I'm sorry about that.  But I'm here to just ask

20  you some questions about what happened, okay?

21  A      Okay.

22  Q      What about your phone?  Didn't you tell the police,

23  they took your phone?

24  A      I probably did have a phone on me.  I have a lot of

25  phones and, I probably did have a phone on me.  I don't

BDC                                  47

1   know.   I just know my money, my coat, I had some marijuana

2   on the ground.   I had some teeth out.

3   Q   I know.   Okay.   And this happens quickly, correct?

4   A   Yes, ma'am.

5   Q   All right.   You are not shot at all, are you?

6   A   No.   No, I'm not.

7   Q   Okay.   And you, did you go to the doctor?

8   A   Yes, I went to the doctor.

9   Q   That same day?

10  A   I went to, I went in the EMS.   They took a report.

11  And I went to the hospital, like a couple hours later during

12  the day.

13  Q   Okay.   So you were well enough to walk away from the

14  scene?

15  A   No, they took a report on me.

16  Q   Okay.   I know.   Listen to my question.   I know.   But

17  you were well enough to go to the hospital a couple of hours

18  later, correct?

19  A   Yes.

20  Q   Okay.   All right.

21            MS, DIALLO:   One second, Judge.

22            THE COURT:   Take you time.

23  Q   You don't have any proof that you were working at this

24  gas station, correct?   Any W2s?

25  A   No.   No.

1    Q    No.  No, 1099s?

2    A    No.

3    Q    No.  It's a cash business you were doing up there?

4    A    Yeah, under the table.

5    Q    Huh?

6    A    Under the table.

7    Q    Under the table.  Okay.  All right.

8    Q    I don't think I have any other questions for you,

9    youngman.

10   A    Are you done?

11                  THE COURT:  Redirect?

12                  MS. MATHEWS:  Just one question.

13                  **REDIRECT EXAMINATION**

14   **BY MS. MATHEWS:**

15   Q    How far away was Mr. Thomas-Dawson when he started

16   shooting at you?  How far away was he from you?

17   A    I mean, we was a little distance away.

18   Q    Okay.  How far though?  What's a little distance?

19   Can you point something out in the courtroom?

20   A    I mean, say from this end to the probably where that

21   second step at up here.

22   Q    So at the end of that wall right there?

23   A    The end of this -- the end of where the judge is at

24   right here at the end of that right here.  The beginning

25   until ---

BDC                              49

1   Q    Okay.

2   A    -- probably where this second step is.

3            MS. MATHEWS:  Twenty feet.  Miss Diallo,

4   would you agree approximately 20 feet?

5            MS. DIALLO:  Okay.  I didn't see it.  I'm

6   sorry.

7            THE COURT:  At the end of the bench?  The

8   second row of seats in the jury box.

9            THE WTINESS:  About the second row.

10           THE DIALLO:  At least 20 feet.

11           MS. MATHEWS:  Perhaps even thirty.

12           MS. DIALLO:  Yeah.

13  Q    You're looking back at him at this point?

14  A    Yes.

15  Q    You see him start to shooting at you?

16  A    Yes, ma'am.

17  Q    And how many times did he shoot?

18  A    Quite a few times.

19  Q    Did you count them?

20  A    I don't want to guess wrong, but I can say about like

21  five times, five six times.  I'm not for sure of the exact

22  times.  And it was a gun, I wouldn't, couldn't keep up with

23  the time period of shooting --

24  A    That wasn't a priority.

25  Q    I really wasn't --

1          MS. MATHEWS: Thank you very much, sir.

2    I have no further questions.

3          THE COURT: Recross? Based of her redirect.

4          MS. DIALLO: Yes. I'm sorry, Judge, what

5    did you say Judge?

6          THE COURT: Based of her redirect.

7          MS. DIALLO: Oh, yes. Yes.

8          **RECROSS EXAMINATION**

9    **BY MS. DIALLO:**

10   Q    So the shooting starts when you're about 20 to 30 feet

11   away at least?

12   A    Yes.

13   Q    Is that a yes?

14   A    Yes.

15   Q    After you had hit somebody, correct?

16   A    Yes.

17   Q    With your fist, right?

18   A    Yes.

19          MS. DIALLO: I have no questions.

20          THE COURT: Who did you hit?

21          THE WITNESS: The person here.

22          THE COURT: You hit the defendant?

23          THE WITNESS: Yes. I'm not for sure of his

24   name.

25          THE COURT: Can you silence that? Mr.

BDC                          51

1   Johnson, what time of day was this when this happened?

2              THE WITNESS:  The time it happened?  It was

3   around twelve o'clock.

4              THE COURT:  A.M. or p.m.?

5              THE WITNESS:  That would be a.m.

6              THE COURT:  You described the gun that you

7   saw?

8              THE WITNESS:  Yes.  It was a black gun.

9              THE COURT:  Do you know the difference between

10  a handgun and a rifle?

11             THE WITNESS:  It was a handgun.

12             THE COURT:  When you were standing at the

13  door, how close were you to the defendant at that point?

14             THE WITNESS:  He had the gun on my back.

15  I was like trying to let him out to lock the door.  By me

16  letting him out, I'm getting escorted out the door with

17  gun.

18             THE COURT:  So is he at your side?

19             THE WITNESS:  Yes, he's on the side of me.

20             THE COURT:  Was anything covering his face?

21             THE WITNESS:  No.

22             THE COURT:  Any questions based off my

23  questions, Miss Mathews?

24             MS. MATHEWS:  None.  Thank you, Your Honor.

25             THE COURT:  Miss Diallo?

BDC                        52

1            MS. DIALLO:  Just one second.

2    BY MISS DIALLO:

3    Q    I'm sorry, this happens around twelve midnight, sir?

4    A    Midnight would be a.m. or --

5    Q    Yes.

6    A    Yes.

7    Q    Okay.   You   had   been   at   the   gas   station   for   a

8    considerable amount of time before this occurs?

9    A    Yes.

10   Q    When  you  say,  the  person,  you  were  behind  the  person

11   as you were escorting out of the store, were you not?

12   A    You said, I was behind him?

13   Q    You  were  going  to  let  somebody  out  of  the  store,  so

14   are you behind that person?

15   A    No, I'm considered like, once I appraoch the person,

16   I'm considered like on the side of him.

17   Q    So you --

18   A    I'm grabbing the door, pulling the door open.  While

19   I'm pulling up the door to let the person out, to lock the

20   door back, I'm having the gun on my side.  I'm looking back

21   I  see  the  gun  right  here?   I'm  telling,  they're  telling

22   me to walk out.  He's telling me to walk outside.

23   Q    Yes,  sir.   You  said  it  was  a  black  gun  or  --  do  you

24   ever say it's a silver gun?

25   A    No, I never said it was silver.

BDC                              53

1   Q     Okay.   Remember testifying page 10:

2         QUESTION:   ALL   RIGHT.   WHAT   DID   THE   GUN

3         LOOK LIKE?

4         ANSWER:   A 40 cal.   COLOR SILVER AT THE TOP.

5         BLACK AT THE BOTTOM.

6   Q     Remember that?

7   A     Uh-huh.

8   Q     Is that true, sir?

9   A     Yes, it is.

10  Q     Okay.   Thank you.

11        THE COURT:   May this witness be excused?

12        MS. MATHEWS:   Yes, Your Honor.

13        THE COURT:   Thank you, Mr. Johnson.

14        THE WITNESS:   All right.

15        (The witness was excused at 11:58)

16        MS.   MATHEWS:   The People call Mohammed Bin

17  Rabed.

18        THE COURT:   All right.

19        (The   Court   recessed   for   a   brief   period

20        for other court matters at 11:59)

21        (The Court back on the record in this matter

22        at 12:09)

23        THE   CLERK:   Back   on   the   record   with   Donnie

24  Thomas-Dawson.

25        THE COURT:   Appearances.

1                    MS. MATHEWS:  Megan Mathews for the People.

2                    MS. DIALLO:  Lillian Diallo, on behalf of

3    Mr. Donnie Thomas-Dawson, who's in front of me.

4                    THE COURT:  Do you want to call your next

5    witness?

6                    MS. MATHEWS:  Thank you, Your Honor.  At

7    this time we would call Mohammed Bin Rabed.

8                    THE CLERK:  "Do you solemnly swear or affirm

9    to interpret and translate Arabic to English, English to

10   Arabic between the Court, counsel and the witness in the

11   matter now pending before the Court?"

12                   THE INTERPRETER:  I do.

13                   THE CLERK:  "Do you solemnly swear the

14   testimony you are about to give to the Court to be the truth,

15   so help you God?"

16                   THE NTERPRETER:  Yes, I do.

17                   (The interpreter was sworn at 12:11)

18                   M O H A M M E D  B I N  R A B E D

19                   WAS THEREUPON CALLED AS A WITNESS HEREIN,

20                   AND AFTER HAVING BEEN FIRST DULY SWORN TO

21                   TELL THE TRUTH AT 12:11, THROUGH AN

22             INTERPRETER, WAS EXAMINED AS FOLLOWS:

23                        **DIRECT EXAMINATION**

24   **BY MS. MATHEWS:**

25   Q    Good morning.

1   A     Good morning.

2   Q     Sir, I'm going to be asking you a series of questions.

3   If you don't understand the question let me know.

4   A     Okay.

5   Q     Don't guess, just, if you don't understand.   All of

6   your responses have to be oral.   So that the gentleman

7   sitting in front of you can record it.

8   A     Okay.

9   Q     As well, it would be helpful if we could hear also.

10  A     Okay.

11  Q     Sir, will you state your name for the record.

12  A     THE WTINESS:  Mohammed Bin Rabed.

13  Q     Mohammed Bin Rabed?

14  A     THE WITNESS:  Mohammed Bin Rabed.

15  A     THE INTERPRETER:  Bin Rabed.

16  A     THE WITNESS:  B-I-N R-A-B-E-D.

17  Q     Thank you.   Bin Rabed.   On January 27th, 2015, were

18  you employed at the Valero gas station located at 10100

19  East Warren?

20  A     THE WITNESS:  Yes.

21  A     THE INTERPRETER:  Yes.

22  Q     And were you working at approximately 12:30 a.m. in

23  the morning?

24  A     Yes.

25  Q     Sir, what do you do at that Valero gas station?

BDC                              56

1  A    THE WITNESS:  Cashier.

2  A    Cashier.

3  Q    Are you behind glass?

4  A    THE WITNESS:  Yes.

5  A    THE INTERPRETER:  Yes.

6  Q    Do you know anyone by the name of Gordon Johnson?

7  A    THE WITNESS:  Yeah.

8  A    THE INTERPRETER:  Yes.

9  Q    And how you do know him, sir?

10 A    He works with us.  He cleans.  He puts some groceries

11 up and stuff like that.

12 Q    Was he working that morning also?

13 A    Yes.

14 Q    Did something happen to Mr. Johnson the morning of

15 the 27th of January 2015?

16 A    Yes.

17 Q    Can you tell us what -- did you observe something

18 happen?

19 A    Yes.

20 Q    At some point during that morning was Mr. Johnson by,

21 in the store with anyone else?

22 A    He was by himself.

23 Q    All right.  Did customers come in when Mr. Johnson

24 was there?

25 A    THE WITNESS:  Yeah.

1    A    THE INTERRETER: Yes.

2    Q    All right. At tome point you indicate something

3    happened to Mr. Johnson --

4    A    Yes. Something happened to him, yes.

5    Q    What was that?

6    A    Someone came in, entered the store. He bought from

7    me Swisher for a dollar. He paid me the dollar. And he

8    went toward the janitor who was standing next to the coffee

9    place. Spoke to him. I was inside. I didn't hear of

10   course. Him and the other gentleman walked out of the

11   station. After while I heard like there was a big commotion.

12                And there was somebody in the car outside

13   who came out and helped him out with that confusion with

14   that.

15   Q    Okay. Let's back up for a little bit. You indicated

16   that someone came in and bought a Swisher?

17   A    Yes.

18   Q    And that person then walked over to Mr. Johnson?

19   A    Yes.

20   Q    How was that -- do you recall what that person looked

21   like?

22   A    He was kind of tall. And is hair was puffed up and

23   kind of like curly. And he was wearing a yellow shirt.

24   A    THE WITNESS: And a skinny guy.

25   A    THE INTERPRETER: And a skinny guy.

BDC

58

1    Q    Do you see anyone in the courtroom today that looks
2    like that gentleman?
3    A    He's right here.
4    Q    Can you tell, describe for the record, what, who I
5    is that he's, what the person is wearing that he's pointed
6    out?
7    A    Yes, he's the one.
8    Q    What is he wearing?
9    A    Black.
10            MS. MATHEWS:    Your Honor, I would ask that
11   the record reflect that the witness has identified Mr.
12   Thomas-Dawson as the person who's in the gas station.
13            THE COURT:    So noted.
14   Q    So Mr. Thomas-Dawson buys the swisher?    You indicate
15   that he walks towards Mr. Johnson?
16   A    Yes.
17   Q    Did you observe anything in Mr. Dawson's hands at that
18   time?
19   A    THE WITNESS:    No. No.
20   A    INTERPRETER:    No.
21   Q    Did you -- and you indicate you behind a glass, is
22   that correct?
23   A    Yes.
24   Q    Do you see Mr. Thomas-Dawson approach Mr. Johnson?
25   A    Yes.

BDC

1   Q    Did you -- could you see whether or not they touched?

2   Were they touching?

3   A    THE WITNESS:  No.  No.

4   A    THE INTERPRETER:  No.

5   Q    And at some point, two of them leave the gas station?

6   A    Yes.

7   Q    How long from the time that Mr. Thomas-Dawson first

8   approached Mr. Johnson till, when they both left?  How long?

9   A    I would say maybe a moment.  It just was a continuous

10  item.

11  Q    Okay.  Perfect.

12              When they walked out of the store, could

13  you still observe them from where you were?

14  A    THE WITNESS:  No.

15  A    THE INTERPRETER:  No.

16  Q    Could you see anything from your store at all outside

17  in the parking lot?

18  A    It was dark in the corner.  I can't see.

19  Q    Did you hear anything?

20  A    I -- the confusion and the like screaming.

21  Q    Did you hear anything in addition to -- what do you

22  mean by confusion?

23  A    Oh, I heard there was something that exploded and

24  screaming.

25  Q    Did you recognize that explosion as anything in

BDC

60

1   particular?

2   A    First I heard that screaming and that like, loud

3   noises. And then I heard the gun.

4   Q    You heard a gun?

5   A    The gun being shot. The shots.

6   Q    How many times -- how many shots did you hear?

7   A    I think once.

8   Q    Did you see any other people, other than Mr. Johnson

9   and Mr. Thomas-Dawson out there?

10  A    Just the two of them.

11  Q    You never saw anyone else out there?

12  A    No, there was nobody.

13  Q    Okay. Did you see any vehicles?

14  A    I saw a small car. It was dark.

15  Q    Could you make out any particular attributes of that

16  vehicle?

17  A    After the shots, they got into the car very speedily.

18  They took off at high speed.

19  Q    Who's they?

20  A    The two people, this gentleman here and the guy that

21  was in the car.

22  Q    Does he -- how does he -- how is he able to see the

23  guy that was in the car?

24  A    I saw the one that was coming out of the car. And

25  when they were screaming and sort of like -- when they came

BDC

1    back this one went into one side of the car and the other
2    one went the other side of the car.
3    Q    So he did see someobody else with Mr. Johnson other
4    than --
5    A    I saw somebody coming but I did not see his face.
6    Q    Do you know what kind of clothing he had on?
7    A    THE WITNESS:  No.
8    A    THE INTERPRETER:  No.
9    Q    All right.  So you didn't see his face but you saw
10   somebody else with Mr. Thomas-Dawson?
11   A    THE WITNESS:  Yes.
12   A    THE INTERPRETER:  Yes.
13   Q    All right.  Both of those two, Mr. Thomas-Dawson and
14   the other person, were by Mr. Johnson?
15   A    Yes.
16   Q    All right.  After you hear the gunshots, do you recall
17   how many gunshots?
18   A    I believe just one.  I did not concentrate.
19   Q    Did you do anything?
20   A    I called the police 9-1-1 and they came.
21   Q    Did you ever see Gordy again that night?  I'm sorry,
22   Mr. Johnson again that night?
23   A    He came back but he was all bloody.
24   Q    Did you see -- okay.  When he came back to the store,
25   he was all bloody?

BDC                              62

1
A     Yes.
2
Q     Did you observe any injuries on him?
3
A     Like his face was swollen, his teeth were broken.
4
Q     Did Mr. Johnson clean up while you were there?
5
A     We were all very scared.  And when we, I got in touch
6
with the police.  The police came in and that's where we
7
stand at that time.
8
Q     Okay.  When the police came in, did you give a
9
statement?
10
A     I told them exactly what I just said.
11
Q     Okay.  You never wrote anything out?
12
A     No.
13
Q     Sir, can you write, read and write in English?
14
A     THE WITNESS:  Difficult.
15
Q     THE INTERPRETER:  Difficult.
16
Q     Okay.  Had you ever seen Mr. Thomas-Dawson or that
17
other man before in your store?
18
A     No, I haven't.
19
Q     So that was the first time that you had seen him?
20
A     Yes.
21
Q     At some point in May of 2015, did you speak with an
22
investigator from the prosecutor's office?
23
A     Yes, like a report.
24
Q     Was there an interpreter present when you spoke with
25
him?

BDC

1
   A    Yes, the manager was there.

2
   Q    But not a authentic or real interpreter?

3
   A    No.   The manager was translating for me.  And I was

4
answering.

5
   Q    Okay.  Are you aware, does your, does the gas station

6
have video?

7
   A    Yes, there is.

8
   Q    Do you know how often that is taped over?

9
   A    I have no idea about this subject at all.

10
           MS. MATHEWS:  I have no further questions,

11
Your Honor.

12
           THE COURT:  Cross examination?

13
           MS. DIALLO:  Thank you.

14
           **CROSS EXAMINATION**

15
**BY MS. DIALLO:**

16
   Q    Good afternoon.

17
   A    THE WITNESS:  Thank you.

18
   Q    I'm going to ask you some questions.  If you don't

19
understand let me know and I'll do my best to clear it up.

20
           THE INTERPRETER:  He asked me to translate

21
for him.  I said, yes.

22
   Q    Sure.  Is it fair to say that inside of the gas station

23
it was well lit, correct?

24
   A    Yes.

25
   Q    And you did not see any weapon inside of the gas

BDC

1
station, correct?

2
A   No.

3
Q   And you were paying attention to Gordy and the other

4
guy, correct?

5
A   Inside the gas station?

6
Q   Yes, inside the gas station.

7
A   Yes.  I was not concentrating.  It was just something

8
normal.

9
Q   It was just normal?  Nothing out of the ordinary?

10
A   No.

11
Q   Okay.  Had you have seen a gun, would that have been

12
out of the ordinary?

13
A   I did not see a gun.

14
Q   Okay.  Thank you.  All right.  And it's fair to say

15
that this happened very quickly, correct?

16
A   It didn't take but two, three minutes.  That's all.

17
Q   Okay.  Thank you.

18
            Were you ever given any picture to try to

19
identify anybody that was part of what  happened at the

20
gas station that night -- early morning?

21
A   Nobody gave me an pictures.

22
Q   Okay.  Would it be fair to say that there's only one

23
black male sitting here with an Afro?

24
            THE   INTERPRETER:   He's  trying  to  tell  me

25
to repeat it again.

BDC

65

1
                    MS. DIALLO:  Okay.

2
                    THE   INTERPRETER:   I'm  going  to  repeat  it

3
again.

4
                    THE WITNESS:  Okay.

5
A    Yes.

6
Q    Okay.  As  a  matter  of  fact,  you  were  asked  in  your

7
statement, would you be able to identify the two black males,

8
if you saw them again, correct?

9
A    I told them that I saw one person not the other person.

10
Q    And  your  response  was,  'I  don't  know.   It  happened

11
so fast.'

12
A    No,  I  said,  I  saw  that  one  person.   The  second  no.

13
That was all I said.

14
                    MS. DIALLO:  Judge, permission to approach?

15
                    THE COURT:  You may.

16
Q    Is  it  fair  to  say  that  you  gave  a  statement  by  phone

17
to the police officers, correct?

18
A    No.

19
Q    It  was  in  person  here  at  the  prosecutor's  office,

20
correct?  You gave a statement here?

21
A    No.

22
Q    At the gas station?

23
A    The investigator came to the gas station.

24
Q    Okay.  All  right.   And  at  that  time  you  told  the

25
investigator what you knew, correct?

BDC

66

1
A    Exactly.

2
Q    And that was May 13, 2015, around --

3
A    -- around 7:45 a.m.?

4
A    Yes.

5
Q    Okay.  Did they go over the questions and answers with

6
you?

7
A    After he asked me, after he asked me -- he asked me

8
if you could read it?  And then see if we would, this is

9
your answer.  I told him, 'I cannot read it.'  And the

10
manager read it and translated it for me.  I told him yeah,

11
that's exactly.  And then I signed it.

12
Q    Okay.  Thank you.  So would it be fair to say that

13
if I tell you in the statement, the question, 'would you

14
be able to identify the two "BMS", -- That's black males.

15
-- if you saw them again, do you see that questions?

16
A    He said, I just said what --

17
Q    I know.  I know.  But your response was, 'I don't know.

18
It happened so fast.'

19
A    He asked me to concentrate on him hundred percent.

20
I said, that was the gentleman I saw.  I saw him for the

21
first time.  And that's why I gave his description.

22
Q    Right.  But you didn't get a chance to really

23
concentrate on him, is that fair to say?

24
A    I saw his face and because -- the hairiness of the

25
situation this is what really made me thinking.

BDC

1
Q    Okay.   Very well.   Did you notice that the person had
2
any facial hair?
3
A    No.
4
Q    Did he have, or you didn't know?
5
A    There wasn't any.
6
Q    There wasn't any facial hair?
7
A    No.
8
Q    Okay.   There was no goatee?
9
A    I didn't pay attention.   You're asking me about the
10
like the full beard?   I did not concentrate on just that
11
goatee.
12
Q    What about something over the lip?
13
A    I did not concentrate on that.
14
Q    Okay.   Did that person have anything about their face
15
that would stand out to you?
16
A    All I saw was like he was kind of like tall and thin.
17
And then is hair was all puffed up.
18
                MS.   DIALLO:   I'm  sorry.   I  do  apoligize,
19
Judge.
20
                THE COURT:   That's okay.
21
Q    Okay.   Just tall and skinny that's it and hair puffed
22
up?
23
A    His face was well wide.
24
Q    White?
25
A    Wide.   Wide.   W-I-D-E.

1
   Q    Oh, wide.

2
   A    Wide.

3
   Q    Turn around.  When you say wide, you mean wide going

4
this way.

5
   A    He's saying no.

6
            MS. DIALLO:  I don't think I have any other

7
questions.  Thank you.

8
            THE COURT:  Redirect.

9
            MS. MATHEWS:  Thank you.

10
            **REDIRECT EXAMINATION**

11
**BY MS. MATHEWS:**

12
   Q    When you saw Mr. Thomas-Dawson, was there anything

13
covering his face?

14
   A    No.

15
   Q    How about his hair, did he have a hood on or anything?

16
   A    No.  Just puffed up.  That's it.

17
   Q    All right.  When you gave your description of Mr.

18
Thomas-Dawson, how did you describe him?

19
   A    I told him tall and kind of like thin.  And his hair

20
was puffed up.  And he was wearing a yellow, a yellow

21
sweater.

22
            MS. MATHEWS:  Thank you.  I have no further

23
questions.

24
            THE COURT:  Recross?

25
            MS. DIALLO:  Just one second.

BDC

1
## RECROSS EXAMINATION
2
BY MS. DIALLO:
3
Q   So you it's fair to say the person that bought this
4
dollar Swisher from you is the person you're identifying
5
as the one that did something to Gordy, correct?
6
A   You went out together to the corner.  Also the gentleman
7
in the car came out.  That's where I heard this high sound
8
of screaming and the, all other mix up.
9
Q   Okay.  Just one second.  But you never said in your
10
statement when you made the description that you heard a
11
gunshot, correct?
12
A   Yes, I did tell them I heard a gunshots.    I just
13
told them one.
14
Q   It says in your statement that 'I heard some screaming
15
and saw the unknown black male fighting with Gordy.'  They
16
knocked Gordy to the ground, and he got up and ran towards
17
Cadillac Street.
18
A   I saw after the gunshots.
19
Q   But is it fair to say, when they were reading it to
20
you, you never said anything in your statement --  you can
21
hold on to that -- about gunshots?
22
A   This is what I told the investigators.  So I don't
23
know what he wrote.  I told them that there was gunshots
24
and the gentleman ran.  He ran in one direction and the
25
other guys ran the other direction with the car.

BDC

1
  Q    Okay.

2
          MS. DIALLO:  Thank you.  I'm through.

3
  Q    What happened to the video?

4
  A    It's  not  my  --  I  do  not  interfere  with  the  video.

5
  Q    Okay.  But  you,  could  you  have  gotten  the  video  of

6
the person that bought the one Swisher?

7
  A    There is cameras inside the store.

8
          MS. DIALLO:  Okay.  Thank you.

9
          THE COURT:  May this witness be excused?

10
          MS. MATHEWS:  I'm sorry?

11
          THE COURT:  May this witness be excused?

12
          MS. MATHEWS:  Yes.

13
          MS. DIALLO:  No objection, Judge.

14
          THE INTERPRETER:  Can he go?  he is saying.

15
          MS. MATHEWS:  Yes.

16
         (The witness was excused at 12:35)

17
          MS.  MATHEWS:  Your  Honor,  now  the  People

18
would call Breaun Glasper.

19
          THE  COURT:  We are going to break for lunch.

20
          MS. MATHEWS:  Okay.

21
          THE  COURT:  It  is  almost  12:35.  So  if  the

22
parties could returnat 1:45 promptly.

23
          MS. DIALLO:  Sure, Judge.

24
          MS. MATHEWS:  Thank you.

25
         (The Court took lunch at 12:36)

BDC

1          (The Court went back on the record at 1:51)

2          THE    CLERK:    Back    on    the    record    with

3    Thomas-Dawson.

4          THE COURT:  Appearances.

5          MS.  MATHEWS:  Good  afternoon,  Your  Honor,

6    Meghan Mathews for the People.

7          MS.  DIALLO:  Good  afternoon  to  you  and  your

8    staff, Lillian Diallo on behalf of Mr. Donnie Thomas-Dawson,

9    who's is present in front of me.

10         THE  COURT:  Good  afternoon.  Good  afternoon

11   Mr. Thomas-Dawson.

12         THE DEFENDANT:  Good afternoon, Your Honor.

13         THE COURT:  Are we ready to proceed?

14         MS.  MATHEWS:  Your  Honor,  I  am.  My  OIC  is

15   not  yet  back  but  my  next  witness  is  available.  And  if

16   the Court is fine with it  I can go ahead and call her.

17         THE COURT:  Call you next witness.

18         THE COURT REPORTER:  Spell your name, please.

19         MS.  GLASPER:  B-R-E-A-U-N,  Glasper,  G-L-A-S-

20   P-E-R.

21         THE COURT REPORTER:  Thank you.

22         THE CLERK:  Raise your right hand, please.

23         "Do you solemnly swear or affirm the testimony

24         you  are  about  to  give  to  the  Court  to  be

25         the truth, so help you God?"

BDC

1          MS. GLASPER:  Yes.

2          THE CLERK:  Thank you.

3          B R E A U N   G L A S P E R

4          WAS   THEREUPON  CALLED  AS  A  WITNESS  HEREIN

5          AFTER  FIRST  BEING  DULY  SWORN  TO  TELL  THE

6          TRUTH AT 1:52 P.M., WAS EXAMINED AND TESTIFIED

7          AS FOLLOWS:

8              **DIRECT EXAMINATION**

9    **BY MS. MATHEWS:**

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    I'm going to be asking you a number of questions.

13   I would ask that you respond orally.  You speak out loud

14   because the gentleman that's sitting in front of you is

15   recording everything.

16   A    Okay.

17   Q    Additionally, we all have to hear.  Okay?

18   A    Uh-huh.

19   Q    Would you, please state your name for the record?

20   A    Breaun Glasper.

21   Q    Miss Glasper, I'll take your attention back to January

22   27, 2015, at approximately one -- I'm sorry, 12:40 in the

23   morning, were you in the location of 11731 Chalmers?

24   A    Yes.

25   Q    Is that in the City of Detroit.?

BDC

73

1  A    Yes.

2  Q    County of Wayne?

3  A    Yes.

4  Q    What's at that location?

5  A    It's a liquor store.

6  Q    Who were you there with?

7  A    I was there with Adante  Poindexter.

8  Q    Did you go into the liquor store at sometime?

9  A    Yes.

10  Q    And did you come -- prior to going into that liquore

11  store -- strike that -- did you arrive by vehicle or by

12  walking?

13  A    Vehicle.

14  Q    Did you park that vehicle?

15  A    Yes.

16  Q    Was it parked in the lot of the liquor store located

17  at 11731 Chalmers?

18  A    Yes.

19  Q    When you parked that vehicle in that lot, did you

20  observe anything, any other vehicle?

21  A    Yes.

22  Q    What type of a vehicle did you observe?

23  A    It was a black Monte Carlo to the left of our vehicle.

24  Q    Did that vehicle have any unusual characteristics about

25  it?

BDC

74

1  A     It did have a busted window.

2  Q     Do you recall where that busted window was?

3  A     The passenger's side.

4  Q     You indicated you went into the liquor store. When

5  you came out of the liquor store -- again strike that.

6  When you first observed that vehicle, that Monte Carlo,

7  was it occupied?

8  A     Yes.

9  Q     Could you tell how many people were in it?

10 A     No.

11 Q     Okay.

12        At some point, did you see anyone exit that

13 vehicle?

14 A     When we arrived to the liquor store one of the people

15 were outside of the vehicle.

16 Q     Did you observe that person?

17 A     Yes.

18 Q     Did you observe whaet he was wearing?

19 A     Yes.

20 Q     What was he wearing?

21 A     He had on a brown Carhartt jacket and dark colored

22 pants, jeans.

23 Q     And then you went into the liquor store?

24 A     Yes.

25 Q     When you came back out, did you see that man?

BDC

1
  A  No.

2
  Q  No. Did anything -- did you happen to see anyone else?

3
  A  No.

4
  Q  At anytime?

5
  A  They --

6
  Q  Did you see, without saying what they did, did you

7
see anybody when you walked out of that store?

8
  A  No.

9
  Q  I'm sorry, out of the party store?

10
  A  No.

11
  Q  Did you get back into your vehicle?

12
  A  No.

13
  Q  Did you happen to see any other men in that parking

14
lot?

15
  A  Yes, inside of the vehicle that was next to us.

16
  Q  What was, what vehicle was next to you?

17
  A  The black Monte Carlo.

18
  Q  Okay. Who did you observe --

19
  A  The guy --

20
  Q  -- in the vehicle?

21
  A  -- that we seen when we approached the liquore store.

22
  Q  The guy in the brown Carhartt jacket?

23
  A  Yes.

24
  Q  Did you observe anyone else?

25
  A  I seen, I couldn't, you know, make anyone out. You

BDC

1    know, because we weren't really paying attention to that.

2    Once we got out and was approaching our car, they got out

3    and they approached us.

4    Q    Okay.  When you say, 'they got out,' you are indicating

5    more than one person?

6    A    Yes.

7    Q    How many people approached you?

8    A    Two.

9    Q    What did the first person that appoached you look like?

10   A    He had on the brown Carhartt and the dark colored jeans.

11   He was like brown colored, dark brown.

12   Q    Okay.

13   A    And he had tattoos like --

14   Q    All right.  Did he have anything in his hands?

15   A    A gun.

16   Q    Now did, you said there's another man that got out

17   of that vehicle and approached you.  What did that man have

18   on?

19   A    That was him.  And he had on a yellow --

20   Q    I'm sorry, you said, 'that was him.'  Who are you

21   referring, are you referring to someone in the courtroom?

22   A    Yes.  Him in the black, Donnie Dawson.

23              MS. MATHEWS:  Your Honor, I would as that

24   the record reflect that Miss Glasper has identified Mr.

25   Thomas-Dawson.

BDC

77

1             THE COURT:  So noted.

2  Q    What did Mr. Thomas Dawson have on?

3  A    He had on a yellow, like light yellow polo turtelneck

4  and his hair was big like it is now.

5  Q    Did you, do you know what type of weapon or what type

6  of a gun the other man had?

7  A    I'm not really knowledgeable as far as guns.  But I

8  do know that it was dark colored.

9  Q    Okay.  Did Mr. Thomas-Dawson have a weapon?

10  A    No.

11  Q    At some point the next day, did you have an opportunity

12  to go to the Detroit Detention Center?

13  A    Yes.

14  Q    Did you look at a live lineup?

15  A    Yes.

16             MS. MATHEWS:  May I approach the witness,

17  Your Honor?

18             THE COURT:  You may.

19  Q    I'm handing you what has been previously marked and

20  admitted as People's exhibit number six.  Can you identify

21  that?

22  A    Yes.

23  Q    And what is that?

24  A    A lineup.

25  Q    Is that the lineup that you viewed the next day?

BDC

1   A    Yes.

2   Q    And would that have been on the 28th of January 2015?

3   A    Yes.

4   Q    Were you able to identify anyone in that lineup?

5   A    Yes.

6   Q    And who did you identify?

7   A    Donnie Dawson.

8   Q    And what number is he?

9   A    Two.

10  Q    Thank you.

11            MS. MATHEWS:  I have no further questions.

12            THE WITNESS:  Thank you.

13            THE   COURT:   Miss  Mathews  what  is  it  that

14  you are referring to?

15            MS.  MATHEWS:   I  was  referring  to  People's

16  exhibit number six, the line up, Your Honor.

17            MS. DIALLO:  May I, Judge?

18            THE COURT:  Cross examination.

19            **CROSS EXAMINATION**

20  **BY MS. DIALLO:**

21  Q    Good morning, good afternoon, Miss Glasper.

22  A    Good afternoon.

23  Q    I'm going to ask you a couple of questions.  If you

24  don't understand something, please let me know and I will

25  do my best to clear it up.

BDC

79

1
A    Will do.

2
Q    Thank you.

3
            Miss   Glasper, in the line up that you saw

4
there was only one person standing in that lineup with a

5
yellow shirt, correct?

6
A    Correct.

7
Q    That   was   one   of   the   things   that   you   used   as   a

8
descriptive tool in order to identify who had done something

9
to you, correct?

10
A    I say, yellow turtleneck.

11
Q    I   understand that, ma'am.   I'm not trying to argue

12
with you.   I'm just -- I just want to know did you see,

13
that was one of the things that you used, a yellow, whatever

14
it was, shirt, turtleneck whatever it was, correct?

15
A    Correct.

16
Q    Okay.   This unfortunate incident that you are here

17
to talk about today, you saw, who you say is this person

18
right here, Mr. Dawson, correct?

19
A    Correct.

20
Q    You did not see Mr. Dawson with any weapon in   his

21
hand, correct?

22
A    Correct.

23
Q    All   right.   I don't have another question for you,

24
ma'am.

25
            THE COURT:   Redirect?

BDC

80

1          MS. MATHEWS:  No redirect, Your Honor.

2          THE COURT:  May this witness be excused?

3          MS. DIALLO:  Yes, ma'am.

4          THE COURT:  Thank you, ma'am.

5          THE WITNESS:  Thank you.

6          (The witness was excused at 2:01)

7          MS. MATHEWS:  Your Honor, may I just speak

8   with Miss Dawson?  I'm sorry, Miss Glasper.  She needs

9   documentation for work.

10          THE COURT:  I'll give you a couple of minutes.

11          MS. MATHEWS:  Thank you.  I will take just

12   one moment.  Miss Glasper, just wait one second.

13          MS. GLASPER:  Okay.

14          (The Court took a short recess)

15          (The Court resumed at 2:04)

16          MS. MATHEWS:  Your Honor, we call Officer

17   Alexamder.

18          THE COURT REPORTER:  Spell your name, please.

19          MR. ALEXANDER:  First name is Maurice, M-

20   A-U-R-I-C-E, last name is Alexander, A-l-E-X-A-N-D-E-R.

21          THE CLERK:  Raise your right hand, sir.

22          "Do you solemnly swear or affirm the testimony

23          you are about to give to the Court to be

24          the truth, so help you God?"

25          MR. ALEXANDER:  Yes.

1
                    THE CLERK:  Thank you.  Have a seat.

2
               M A U R I C E   A L E X A N D E R

3
               WAS   THEREUPON   CALLED   AS   A   WITNESS   HEREIN,

4
               AND   AFTER   HAVING   BEEN   FIRST   DULY   SWORN   TO

5
               TELL   THE   TRUTH   AT   2:04   P.M.,   WAS   EXAMINED

6
               AND TESTIFIED AS FOLLOWS:

7
               **DIRECT EXAMINATION**

8
**BY MS. MATHEWS:**

9
Q    Good afternoon, sir.

10
A    Good afternoon, ma'am.

11
Q    Will you, please state your name for the record.

12
A    My name is Officer Maurice Alexander.

13
Q    Officer were you -- where are you employed?

14
A    Detroit Police Department.

15
Q    How long?

16
A    Four and a half years.

17
Q    Were you employed on January 27, 2015?

18
A    Yes.

19
Q    At approximately 12:30 a.m. were you in the vicinity

20
of 10100 East Warren, in the City of Detroit?

21
A    Yes.

22
Q    County of Wayne?

23
A    Yes.

24
Q    What's at that location?

25
A    What is it, the location?

BDC

1    Q    What's at that location?

2    A    Oh, it's a gas station.  A Valero gas station.

3    Q    Why was it that you were at that location?

4    A    Well I got a call that it was an RA at that particular

5    location.

6    Q    Did you arrive by yourself or with someone else?

7    A    I was full marked scout car along with my partner

8    Tom Collins that night.

9    Q    Were there other officers present at that time?

10    A    Yes.

11    Q    How many officers responded to the scene?

12    A    It was approximately, maybe six officers along with

13    a sergeant, one sergeant.

14    Q    Did you, along with those other officers, secure that

15    scene?

16    A    Yes.

17    Q    And did you interview anyone at that location?

18    A    Well I was getting bits and pieces of the information,

19    what happened, because at the time the victim he was kind

20    of like all over the place.  Because he was --

21                    MS. DIALLO:  I'm going to object to because

22    'while he was all over the place.  He's just all over the

23    place.'

24                    THE COURT:  Speculation??

25                    MS. DIALLO:  Yes.

1          THE COURT:  Objecting sustained.

2          MS. DIALLO:   Thank you.

3   Q   Did you have an opportunity to observe the victim?

4   A   Yes.

5   Q   How did the victim appear to you?

6   A   A little confused.  He was, he was just, he had stated

7   he was just robbed.

8          MS. DIALLO:   Your Honor, just object to the

9   hearsay.

10  Q   Don't say what he said.

11         THE COURT:  Sustained.

12  Q   How did he look to you?  How did he appear to you?

13  What was his --

14  A   Scared.  Confused.

15  Q   Did he -- were you able to obtain his name?

16  A   Yes.

17  Q   What was that?  You're looking at something.

18  A   Yes.

19  Q   Are you trying to refresh your recollection?

20  A   Well, yes.  It was over a year ago --

21  Q   Okay.

22  A   -- so I don't remember his name exactly.

23  Q   You don't recall the name?

24  A   Based on the information it's Gordon Johnson.

25  Q   Okay.  Were you able to ascertain whether or not there

1    had been video at the gas station?

2    A    Yes,   I  was  told  there  was  a  video  footage  of  the

3    incident.

4    Q    Did you ever secure that video footage?

5    A    I did not.

6    Q    Do you know if it was secured?

7    A    I do not.

8    Q    Did you ever observe any of the security footage?

9    A    No.

10   Q    Did you keep that scene secure until the tech officers

11   arrived?

12   A    I did.

13                    MS.   MARTHEWS:    Thank   you.    No    further

14   questions.

15                    THE COURT:  Cross examination?

16                    MS.  DIALLO:   Briefly.   May  I  approach,   so

17   I can see the report he was looking at?

18                    THE COURT:  Yes.

19                    CROSS EXAMINATION

20   BY MS. DIALLO:

21   Q    How are  you?

22   A    How are you doing, ma'am?

23   Q    I'm good.

24                    In  the  report  --  and good afternoon  --  that

25   you have here, we can share.  The information given to you

                              85

1   is that someone attempted to shoot someone else? That was

2   one of the things indicated, correct?

3   A    Yes.

4   Q    There was also information in there that a True Religion

5   jacket was taken and $30.00 (THIRTY) dollars was taken,

6   correct?

7   A    Yes.

8   Q    Okay. Is there anything in there about a phone being

9   taken or anything else other than what you have in your

10  report?

11  A    No. Not in my report.

12  Q    Okay. Just one second.

13                    Did you get the description of the person

14  that allegedly did this?

15  A    It was a brief description in my report -- yes.

16  Q    In your report. Did that person have any scars or

17  knots on their forehead like this person right here?

18  A    I wasn't told anything about knots.

19  Q    Okay. Just one second.

20                    As a matter of fact that person had on --

21  the description that you had, had on a yellow hat, yellow

22  shirt and blue jeans, correct -- according to your

23  description?

24  A    Not in my report.

25  Q    That's not your -- what dot are you, sir?

86

1    A    I'm dot one.

2    Q    Sir, were you working with a partner that day?

3    A    Yes.  Tom Collins.

4    Q    Mr. Tom Collins?  Did you say 'Collins?'

5    A    Collins.

6    Q    Collins.  Oh.  I don't have any other questions for

7    you because Tom Collins doesn't have anything to do with

8    this.  Thank you.

9                    MS. DIALLO:  Just one second, Judge.

10   Q    You didn't get any description about any perpetrator

11   wearing a yellow hat, correct?

12   A    No.

13   Q    Okay.  Thank you.

14                    REDIRECT EXAMINATION

15   BY MS. MATHEWS:

16   Q    However, you did get a description -- one of the

17   assailants, didn't you?

18   A    Yes.

19   Q    And what was that description?

20   A    It was a black male with an Afro, approximately six

21   feet, 170 pounds.

22   Q    Was there any scars or marks or anything mentioned?

23   A    No, not in my report.

24   Q    Are you sure?  You want to look at your report to

25   refresh your recollection -- perhaps on page two?

87

1          MS. MATHEWS:  May I approach, Your Honor?

2          THE COURT:  You may.

3    A    Yes.

4    Q    Yes, you did get some type of a description?

5    A    Oh, well, tattoos around the neck area, yes.

6          MS. MATHEWS:  Thank you.  I have no further

7    questions.

8          THE COURT:  Miss Diallo?

9          MS. DIALLO:  No further questions.  Thank

10   you so much.

11         THE COURT:  May this witness be excused?

12         MS. MATHEWS:  He may.

13         MS. DIALLO:  On behalf of defense, yes.

14         THE COURT:  Thank you officer.

15         THE WITNESS:  Thank you.

16         (The witness was excused at 2:12)

17         THE COURT:  You want to call your next

18   witness.

19         MS. MATHEWS:  Thank you.  We will call Raymond

20   Diaz.

21         THE CLERK:  Raise your right hand, please.

22   "Do you solemnly swear or affirm the testimony

23   you are about to give to the Court to be

24   the truth, so help you God?"

25         MR. DIAZ:  I do.

1        THE CLERK:  Thank you.  Have a seat.

2        R A Y M O N D   D I A Z

3        WAS  THEREUPON  CALLED  AS  A  WITNESS  HEREIN,

4        AND  AFTER  HAVING  BEEN  FIRST  DULY  SWORN  TO

5        TELL  THE  TRUTH  AT   2:13  P.M.,  WAS  EXAMINED

6        AND TESTIFIED AS FOLLOWS:

7                 **DIRECT EXAMINATION**

8    **BY MS. MATHEWS:**

9    Q    Good afternoon, sir.

10   A    Good afternoon.

11   Q    Will you, please state your name for the record.

12   A    My name is Raymond Diaz.

13   Q    Mr. Diaz, are you employed?

14   A    Yes, I am.

15   Q    Where are you employed?

16   A    I'm a Detroit Police Officer.

17   Q    Are you -- how long have you been so employed?

18   A    I've been a police officer for fourteen and a half

19   years.

20   Q    Are you assigned to any special division?

21   A    Yes, I am.

22   Q    And what is that?

23   A    I'm currently assigned to the Evidence Tech Unit.

24   Q    What do you do as an evidence tech?

25   A    As an evidence tech my job is to process and document

                           89

1    the scene of a crime and all its various forms.  The way

2    I do that is through photographs when required.  I search

3    for and collect fire arms evidence; that would be casings,

4    guns or bullets.  I sketch the scene when required.  I search

5    for and collect scene reliated evidence.  And when required

6    I also process for latent fingerprints.

7    Q    Sir, on, were you so employed on January 27, 2015?

8    A    Yes, I was.

9    Q    And did you have an occasion to be at 10100 East Warren

10   in the City of Detroit?

11   A    Yes.

12   Q    Can you tell me what's at that location?

13   A    That location is a Valero gas station.

14   Q    How did you come to be there?

15   A    I was dispatched to process the scene of an armed

16   robbery of a citizen, where shots were fired.

17   Q    Were you by yourself?  Did you arrive at that location

18   by yourself?

19   A    I have a partner.

20   Q    And who is your partner?

21   A    Sara Schulz.

22   Q    Who  is present while you an Officer Schulz arrived?

23   A    Scout Five-Two I believe it was and Sgt. Foster from

24   the Eastern District.

25   Q    Had the scene been secured when you arrived?

90

1    A    Yes.

2    Q    Now how -- did you process that scene?

3    A    Yes, I did.

4    Q    And how did you do that?

5    Q    Once I arrived, I spoke wih Sgt Foster, who was holding

6    the scene with the officers.  He gave me a brief synopsis

7    of what occurred.  I proceeded to walk through the scene.

8    I gathered some notes.  I did a rough sketch of the scene.

9    I marked the evidence and then I photographed the entire

10   scene area.  And subsequently I collected the evidence.

11   Q    I'm handing you a stack of -- they haven't been marked

12   though.

13                THE COURT:  Go ahead and mark them.

14                MS. MATHEWS:  I should have.  I apologize.

15                (People's exhibits 13 thru 66 marked)

16   Q    You indicated that you were processing the scene,

17   correct?

18   A    Yes.

19   Q    What was the physical description of that scene?

20   A    The area of the scene encompasses the southeast corner

21   of Cadillac and East Warren.  The area is a one story

22   building, brick housing the gas station.  North of the

23   building itself there's four gas pumps each with two

24   stations.  A total of eight.  The area was fairly lit.

25   The canopy underneath the gas pumps was all well lit.  There

91

1    was one working street light on the westside of the street

2    and one business light on the westside of the building.

3              MS. MATHEWS:  May I approach, Your Honor?

4              THE COURT:  You may.

5    Q    I'm handing you People's proposed exhibit 66.  You

6    recognize that?

7    A    Yes.

8    Q    Can you describe for us what that is, sir?

9    A    This is the sketch, not to scale, of the area

10   encompassing the scene at 10100 the Valero gas station.

11   At the center of the sketch is the gas station building.

12   The gas pump area with the canopy and the street of East

13   Warren, Cadillac. The northwest corner there's another gas

14   station, a Sunoco.  On the northside of the street.  There's

15   a church.  And to the west there's several residences.

16   Q    Now, Officer Diaz, on that sketch there, in addition

17   to the numbers on the pumps, there are six numbers --

18   A    Yes.

19   Q    -- with yellow dots.  Can you describe to us what those

20   represent?

21   A    The first five, one thru five, are fired casings that

22   I recovered at different locations within the pump gas area.

23   The casings were all nine millimeter Blazzer brand.  The

24   item number six are five packets, small individually packets

25   of suspected marijuana.

1   Q    There also appears to be some teeth in between pump
2   one and the door.  What does that represent?
3   A    These are teeth that, based on the information that
4   I received and also photographing the victim as he was
5   assaulted. He lost several teeth in the incident. Those
6   are marked as teeth.  Also there's a red area that contains
7   suspected blood.
8   Q    Thank you.  There's also a number of triangles on that.
9   A    Yes.
10  Q    What do those represent?
11  A    The triangles represent cameras that were on the
12  exterior side of the building.  There are four of them.
13  Three on the northside and one on the westside.  I mean,
14  I'm sorry, on the eastside.
15  Q    While you were processing the scene, did you have an
16  opportunity to determine whether or not those cameras were
17  working?
18  A    They appeared working.  I did not see a video or talk
19  to anyone to ascertain if they were working at that time.
20  Q    So you have no information as to that?
21  A    That is correct.
22  Q    There's also, appears to be like a starlight from
23  Cadillac.  What would that be, sir?
24  A    Yes, two of those are the, the one on the westside
25  of the building that is a working strobe or light that's

1    on the building west wall.  And directly across the street

2    is a working city street light.

3    Q    And you indicated that area was well lit for being

4    at night?

5    A    Fairly lit, yes.

6    Q    Now there's a number of photographs taken, is that

7    correct?

8    A    Yes.

9    Q    I'm handing you --

10                MS. MATHEWS:  Your Honor, we'd move to admit

11   People's exhibit 66.

12                THE COURT:  Any objection?

13                MS. DIALLO:  No objection, Your Honor.

14                THE COURT:  People's 66 is admitted.

15                (People's exhibit 66 admitted)

16                MS. MATHEWS:  Thank you.

17   Q    These have individually been marked from People's

18   proposed exhibit 13 thru 65.  I'd ask you to look at those

19   and identify them, if you can.  What are those?

20   A    These are the photographs that I took to illustrate

21   the scene as I observed it on the night in question.

22   Q    Sir, when you took those photos, some of those photos

23   depict the numbers that you indicated -- I'm sorry, like

24   the bullet casings and the location of the pumps, the door

25   and the interior or the station, is that correct?

1   A     That is correct.

2   Q     On your sketch to scale and also in those photos there's

3   triangles for, markers with one thru five indicating the

4   bullet casings.

5   A     The shell casings, yes.

6   Q     You assigned those numbers randomly, would that be

7   correct?

8   A     Yes.  I just try to keep them in an order.  I went

9   from north to south, and then from east to west.

10  Q     Okay.  So those don't necessarily correlate to when

11  those shots were fired?

12  A     That is correct.

13  Q     In fact, you have no idea of where that shooter would

14  be specifically when those bullets, where those bullet

15  casings landed?

16  A     In this particular case, no, I cannot say for certain,

17  because I did not have a impact area.  I searched the entire

18  area to the north, to the northwest and to the west.  I

19  did not find any strike marks to be able to say the casings

20  are at this location.  The impacts are at this location

21  they were shooting in any particular direction.

22  Q     Thank you.  I understand that.

23        There are pictures in fact of evidence number

24  one, which would be the first casing found, is that correct?

25  A     That is correct.

1    Q    Within those photos?

2    A    Yes.

3    Q    All the way through the second one, the third, the

4    fourth and the fifth?

5    A    Yes.

6    Q    The fifth one, where was that found?

7    A    The fifth one was just west of the gas pump number

8    one.

9    Q    And the teeth that you found, are there photographs

10    of those in there?

11    A    Yes, there are.

12    Q    And where were those found?

13    A    Those were south of pump number one and two. Between

14    gas pump one and two and the building.

15    Q    Did you also take photos of the victim?

16    A    Yes, I did.

17    Q    Were you able to observe his injuries?

18    A    Yes, I did.

19    Q    Can you tell us what injuries you observed?

20    A    He exhibited brusing and lacerations to the right-side

21    of his face. And I had to open his mouth and he was clearly

22    missing teeth.

23    Q    Do you recall how many teeth were located on the scene?

24    A    I was able to photograph four teeth.

25    Q    Four?

1    A    Yes.

2                    MS. MATHEWS:  People's exhibits 13 thru 65

3    be admitted?

4                    THE COURT:  Any objection?

5                    MS. DIALLO:  Just one second, Judge.  No

6    objection, Judge, 13 thru 65.

7                    THE CUORT:  People's 13 thru 65 are admitted.

8                    (People's exhibits 13 thru 65 admitted)

9                    Miss Mathews, if you could have Officer Diaz

10   testify as to which exhibit is illustrated what you were

11   asking about, like the teeth, the casings?

12                   MS. MATHEWS:  Absolutely.  Thank you, Your

13   Honor.

14   Q    All those exhibits, 13 thru 65, can you tell us which

15   ones specifically reflects the various teeth?

16   A    Yes.  Exhibit 16 is a far back area and you can see

17   clearly three of the teeth and the suspected blood on the

18   ground between gas pump number one and the building.  Exhibit

19   17 is one tooth by itself.  Exhibit 18 is another tooth

20   by itself.  Exhibit 26 is another tooth by itself.

21                   THE COURT:  Which exhibit was a picture of

22   the complainant's mouth open?  You said, you took a picture

23   of his mouth open?

24                   THE WITNESS:  Yes.  There is two of them.

25                   MS. MATHEWS:  Your Honor, there's copies

97

1    of those, were People's exhibit number nine.

2                    THE WITNES: Exhibit 59 is a, the victim Mr.

3    Johnson's mouth open.  Again, you can see where he's missing

4    some teeth.  Exhibit 20 shows the injuries above and below

5    the right eye.  Exhibit 21 is a closeup of the injury above

6    the right eye.  Exhibit 22 exhibits both the injuries above

7    and below the right eye and below the left eye.  And the

8    other photograph with Mr. Johnson's mouth open is exhibit

9    24.

10                   THE COURT:  Thank you officer.

11   Q    Thank you, Officer Diaz.

12                   Did you mark and, all of those exhibits,

13   the casings?

14   A    Yes, I did.

15   Q    And tag them?

16   A    Yes, I did.

17   Q    The teeth, what was done with that?

18   A    That was not collected.  Those are considered body

19   parts.  Unless there is a deceased person the medical

20   examiner collects those.

21                   MS. MATHEWS:  Thank you.  I have no further

22   questions.

23                   THE COURT:  Cross examination?

24                   MS. DIALLO:  Just one second, Your Honor.

25                   **CROSS EXAMINATION**

1    **BY MS. DIALLO:**

2    Q    Good afternoon, Officer Diaz.

3              Let me get this straight.  You did not do

4    any video footage of this particular incident, correct?

5    A    I did not.

6    Q    Okay.  you made a sketch, not to scale though, of what

7    you observed when you got there, correct?

8    A    That is correct.  The sketch in its entirely is not

9    to scale.  However, there are some measurements in the sketch

10   and those measurements are accurate.

11   Q    Okay.  Thank you.

12             You have the admitted exhibit that you drew?

13   A    No.  It's on the table.

14   Q    So in your admitted exhibit number    --

15             THE COURT:  Sixty-six.

16   Q    Is it 66?

17             THE COURT:  Yes.

18             MS.  DIALLO:    Thank    you.     Sixth-six.

19   Permission, Judge?

20             THE COURT:  You may.

21   Q    You indicated that it was fairly lit, correct?

22   A    Yes.

23   Q    There were cameras throughout the location, correct?

24   A    Yes, on the exterior along the north wall and one on

25   the east wall.

1    Q    Okay.  But that covered the gas station pump area?

2    A    Yes, three of them.  The one on the east, northeast

3    corner faces northwest.  The one on the westside, northwest

4    corner faces northeast and the one at the center faces

5    directly north.

6    Q    Okay.  Thank you.  You could not find any strike marks

7    that makes you to tell which direction this could have been

8    fired from or to, correct?

9    A    That is correct.

10   Q    All right.  And the casings themselves, did they appear

11   to be damaged at all?

12   A    No.

13                   MS. DIALLO:  Just one second, Judge.

14                   THE COURT:  Take you time.

15   Q    And that was the sum and substance of what you did?

16   You took the pictures, collect, had them tagged where the

17   evidence was, correct?

18   A    That is correct.

19   Q    I'm sorry.  You did, you noted the camera directions,

20   correct?

21   A    That is correct.

22   Q    You didn't take any witness statement or anything,

23   did you?

24   A    I did not.

25   Q    Okay.  Did you do measurements to see how far from

1    the building to the, the side of the building?

2    A    The side on the westside?

3    Q    Yes.

4    A    No, there was no measurements.  All the measurements

5    are north and south and where each individual casing is.

6    Q    Okay.  Just a second.  I want to make sure.  Did you

7    preserve the shells for prints, sir?

8    A    I collect all the evidence in a manner consistent with,

9    to preserve any possible evidence that could be used later.

10    Q    Absolutely.  But it's not your job to print the shells,

11    correct?

12    A    No, it is not.

13    Q    Just collect the evidence?

14    A    That is correct.

15                    MS. DIALLO:  Thank you so very much.

16                    THE COURT:  Redirect?

17                    MS. MATHEWS:  No further questions, Your

18    Honor.

19                    THE COURT:  May this officer be excused?

20                    MS. DIALLO:  Yes, ma'am.

21                    MS. MATHEWS:  Yes.

22                    THE COURT:  Thank you, Officer Diaz.  You

23    want to call your next witness.

24                    (The witness was excused at 2:36)

25                    MS. MATHEWS:  Officer Lyons.


                                101

1          THE COURT REPORTER:  Spell  your name, please.

2          MR. LYONS:  T-R-E-Y.

3          THE COURT REPORTER:  Your last name.

4          MR. LYONS:  Lyons, L-Y-O-N-S.

5          THE CLERK:  Raise your right hand, please.

6          "Do   you   solemnly   swear   or   affirm   the

7          testimony you are about to give to the Court

8          to be the truth, so help you God?"

9          MR. LYONS:  Yes.

10         THE CLERK:  Have  a seat.

11         T R E Y  L Y O N S

12         WAS  THEREUPON  CALLED  AS  A  WITNESS  HEREIN,

13         AND  AFTER  HAVING  BEEN  FIRST  DULY  SWORN  TO

14         TELL  THE  TRUTH  AT  2:36  P.M.,  WAS  EXAMINED

15         AND TESTIFIED AS FOLLOWS:

16         **DIRECT EXAMINATION**

17  **BY MS. MATHEWS:**

18   Q    Good afternoon.

19   A    Good afternoon.

20   Q    Will you state your name for the record.

21   A    Trey Lyons.

22   Q    Officer -- I'm sorry, are you employed?

23   A    Yes.

24   Q    Where?

25   A    City of Detroit Police Department.

102

1   Q    How long have you been so employed?

2   A    Four and a half years.

3   Q    Were you working on January 27, 2015?

4   A    Yes.

5   Q    Were you in the area of -- approximately 1:40 a.m.,

6  were you in the area 17046 Harper?

7   A    Yes.

8   Q    Were you alone or with someone?

9   A    With someone.

10   Q    Who are you with?

11   A    My partner, Police Officer Nicholas Dedeluk.

12   Q    Were you in a marked vehicle?

13   A    Yes.

14   Q    When you arrived at that location, did you observe

15  anything?

16   A    Yes, I did.

17   Q    And what was that?

18   A    I observed a vehicle that was wanted in a carjacking.

19   Q    Strike that.

20               Did you observe, had you been earlier

21  instructed to be on the lookout for a particular vehicle?

22   A    Yes.

23   Q    What type of vehicle was that?

24   A    It was a black Monte Carlo with plastic in the rear

25  driver's side window.

1    Q    Did you observe that vehicle in that area?

2    A    I did.

3    Q    Did you observe anyone out -- where was that vehicle?

4    A    It was parked at the gas station on Harper.  I believe

5    that was a Mobile gas station.

6    Q    Was there anyone outside of that vehicle?

7    A    Yes.

8    Q    Can you describe what that person was wearing?

9    A    She was wearing a light blue hat, tan coat and blue

10   jeans.

11   Q    Could you observe whether or not there's anybody inside

12   the Monte Carlo?

13   A    Yes.

14   Q    Was there?

15   A    There were two people.  One of them Mr. Thomas-Dawson,

16   who is seated right there, and another person in the back

17   seated behind him.

18   Q    Where was Mr. Thomas-Dawson seated?

19   A    He was in the driver's seat.

20   Q    What happened -- did you pull into the driveway of

21   the gas station?

22   A    We did.

23   Q    What happened when you pulled into the driverway of

24   the gas station?

25   A    I ordered the occupants of the vehicle to show me their

104

1    hands.   And the male who was outside of the car at the gas

2    pumps next to the Monte Carlo he took off running.

3    Q    Did you pursue him?

4    A    I did not.

5    Q    Did your partner?

6    A    Yes.

7    Q    When you ordered Mr. Thomas-Dawson from the vehicle,

8    what was he wearing?

9    A    He was wearing a yellow shirt and blue jeans.

10   Q    How would you describe his hair?

11   A    It was an Afro, large.   Similar to what he's wearing

12   right now.

13   Q    You indicated there was somebody else in the vehicle,

14   is that correct?

15   A    Yes.

16   Q    Who was that?

17   A    He was later identified as a Donte Leonard.

18   Q    How's he dressed?

19   A    He was wearing an all black coat, black jeans, white

20   shoes.

21   Q    Did you search Thomas-Dawson and Mr. Leonard?

22   A    Yes.

23   Q    Was anything recovered?

24   A    Yes.

25   Q    What was that?   And from whom?

1    A    I recovered 26 Zanax pills from Mr. Dawson and 17 --

2                    MS. DIALLO:   Your Honor, suspected Zanax

3    pills, Judge.

4                    MS. MATHEWS:   Sure.

5                    MS. DIALLO:   Thank you.   I would object to

6    conclusions.

7                    THE COURT:   Sustained.

8                    MS. DIALLO:   Thank you.

9    A    I recovered suspected marijuana from Mr. Dawson.

10   Q    Was the vehicle searched?

11   A    Yes.

12   Q    Was anything recovered in the vehicle?

13   A    I don't recall.   I didn't recover anything from the

14   vehicle.

15   Q    Earlier you identified Mr. Thomas-Dawson sitting in

16   the courtroom.

17   A    Yes.

18   Q    What is he wearing today?

19   A    He's wearing a black shirt, black pants, black shoes.

20                    MS. MATHEWS:   Your Honor, the record would

21   reflect that Officer Lyons has identified Mr. Thomas-Dawson.

22                    THE COURT:   So noted.

23                    MS. MATHEWS:   Thank you.

24   Q    At some point did you learn that Mr. Brown had been

25   apprehended?

106

1   A   Yes.

2   Q   You had nothing to do with that apprehension?

3   A   No.  I just saw him run.

4   Q   So while your partner, while, and you indicated that

5   your partner --

6   A   Yes.  Partner chased after Mr. Brown on foot.

7   Q   And you stayed at the vehicle?

8   A   Yes.

9               MR. MATHEWS:  Thank you.  I have no further

10   questions.

11              THE COURT:  Cross examination?

12              MS. DIALLO:  Thank you.

13              **CROSS EXAMINATION**

14   **BY MS. DIALLO:**

15   Q   Just one second officer Lyons.  Good afternoon to you,

16   sir.

17   A   Good afternoon.

18   Q   You seareched this person right here Mr. Donnie

19   Thomas-Dawson?

20   A   Yes.

21   Q   You didn't recover anything on his, any weapons,

22   correct?

23   A   I didn't recover any weapons.

24   Q   Okay.  Thank you.

25              So did you get a True Religion jacket off

1    of his person?

2    A    No.  The only things I recovered from Mr. Thomas-Dawson

3    were the suspected Zanax pills and the suspected marijuana.

4    Q    Okay.  Just one second.

5                    What kind of vehicle was Mr. Thomas-Dawson

6    in, was it a 1997 Monte Carlo or a 2007 Monte Carlo?

7    A    I think it was  a 2007.

8    Q    If it was a 1997 Monte Carlo in the report, would you

9    quibble with that?

10   A    I don't recall.  It was a black Monte Carlo.

11   Q    Yes.  And can we agree that there is a difference

12   between a '97 and a 2007  Monte Carlo speak.

13   A    Yes.

14   Q    Okay.  All right.  Do you remember the description

15   of the vehicle you were looking for -- the year?

16   A    No.  Just a black Monte Carlo.  What really stood out

17   about it --

18   Q    I know.  I asked you, do you remember?  You can just

19   answer my question, please.  We are talking about the year.

20   Do you remember the year that you are looking for?

21   A    No.

22   Q    Okay.  Just one second.

23                    How many vehicles did you see over there

24   that particular day, that evening at that gas station, the

25   early morning?

1    A    At least two.

2    Q    At least two.  Okay.  But Mr. Thomas-Dawson did not

3    match the desecription that was given, correct -- of the

4    people that had done this?

5    Q    I don't remember that.

6    Q    Okay.  Just one second.  Did you have an opportunity

7    to review the preliminary exam transcript?

8    A    No.

9    Q    No.  Okay.  Just one second.  Just one second, okay?

10                    MS. DIALLO:  Just one second, Judge.  No

11   further questions.  Thank you.

12                    THE COURT:  Redirect?

13                    MS. MATHEWS:  Thank you.

14                    **REDIRECT EXAMINATION**

15   **BY MS. MATHEWS:**

16   Q    You indicated that you are on the lookout for a Monte

17   Carlo, any particular characteristics of that Monte Carlo

18   you were looking for?

19   A    It was very unique because the back window had a black

20   plastic bag on the so  --

21   Q    Thank you.

22                    MS. MATHEWS:  I have no further questions,

23   Your Honor.

24                    THE COURT:  Recross?

25                    MS. DIALLO:  No, thank you, Judge.

1          THE COURT:  May this officer be excused?

2          MS. MATHEWS:  Yes, Your Honor.  Thank you.

3          THE COURT:  Thank you officer Lyons.

4          (The witness was excused at 2:45)

5          MS. MATHEWS:  We would call Officer Dedeluk

6   as  our final witness.

7          MS. DIALLO:  Who?

8          MS. MATHEWS:  Dedeluk.

9          MS. DIALLO:  Dedeluk.

10          THE COURT REPORTER:  Spell your name, please.

11          MR.  DEDELUK:  Nicholas,  N-I-C-H-O-L-A-S,

12   D-E-D-E-L-U-K.

13          THE CLERK:  Raise your right hand, please.

14          "Do you solemnly swear or affirm the testimony

15          you are about to give to the  Court to be

16          the truth, so help your God?"

17          MR. DEDELUK:  Yes.

18          THE CLERK:  Have a seat.

19          N I C H O L A S   D E D E L U K

20          WAS  THEREUPON  CALLED  AS  A  WITNESS  HEREIN,

21          AND  AFTER  HAVING  BEEN  FIRST  DULY  SWORN  TO

22          TELL  THE  TRUTH  AT  2:46  P.M.,  WAS  EXAMINED

23          AND  TESTIFIED  AS  FOLLOWS:

24          **DIRECT EXAMINATION**

25   **BY MS. MATHEWS:**

110

1    Q    Good afternoon, sir.  Please state your name for the
2    record.
3    A    Nicholas Dedeluk.
4    Q    Are you employed, sir?
5    A    Yes.
6    Q    Where?
7    A    City of Detroit Police Department.
8    Q    And how long have you been so employed?
9    A    Approximately seven and a half years.
10   Q    Were you employed on January 27, 2015?
11   A    Yes.
12   Q    At approximately 1:40 in the morning, were you in the
13   area of 17046 Harper?
14   A    Yes.
15   Q    Is that in the City of Detroit?
16   A    Yes.
17   Q    What was at that area?
18   A    A Mobile gas --
19   Q    First of all were you along or with anyone else?
20   A    My partner.
21   Q    And who's that?
22   A    Trey Lyons.
23   Q    Okay.  Again, what's at that location?
24   A    A Mobile gas station.
25   Q    What do you, do you observe anything once you get there?

111

1    A    Yes.

2    Q    What was that?

3    A    A black Monte Carlo with the rear driver's side window

4    had a bag over it.  It was a description given by another

5    unit.

6              MS.  DIALLO:    I'm  going  to  object  to  the

7    description 'given by the other unit.'  It's hearsay, Judge.

8    Just what he observed.

9              MS.  MATHEWS:   Your Honor, it's  not offered

10   for the truth.  It's offered for while he was, why he was

11   there in the area.

12             THE COURT:  The objection is overruled.

13             MS. DIALLO:  Thank you.

14   Q    And what did you do upon observing that black Monte

15   Carlo with the plastic in the rear window?

16   A    We pulled into the gas station.

17   Q    Did you observe anything else?

18   A    Yes.  When I pulled into the gas station there was

19   a male outside of the vehicle.

20   Q    Was he in the vicinity of that vehicle?

21   A    Yes.

22   Q    Where was he in location to that vehicle?

23   A    There was another vehicle parked behind the black Monte

24   Carlo and he was at the driver's side window of that vehicle.

25   Q    What happened when you pulled up?

112

1    A    He matched the description of perps wanted.

2    Q    What was he wearing, if you recall?

3    A    A light brown Carhartt type coat and black pants.

4    Q    Did you make eye contact with that man?

5    A    Yes.

6    Q    What happens after you made eye contact with him?

7    A    I walked on the passenger side of the vehicle that

8    he was standing next to and I asked to see his hands.

9    Q    What happened then?

10   A    He took off running westbound on Harper.

11   Q    What did you do?

12   A    I followed on foot.

13   Q    Were you, where did he go once he ran down Harper?

14   A    He ran westbound on Harper and then southbound on

15   Harvard from Harper.

16   Q    Did, at some point did you lose sight of him?

17   A    Yes, I did.

18   Q    Were you able to, at some point, were you assisted

19   at any point with, by any other officers?

20   A    Yes.

21   Q    And at some point thereafter was that man detained?

22   A    Correct.  Yes.

23   Q    What as that man's -- did you learn his identity?

24   A    Yes.

25   Q    What was his name?

113

1    A    His last name was Brown.

2    Q    Did you eventually come back to the gas station?

3    A    Yes, I did.

4    Q    Did you observe anyone else that's in the courtroom

5    today at that gas station that night?

6    A    Yes, the gentleman with the black shirt with the Afro

7    was at the gas station with my partner and another gentleman.

8    Q    Do you recall what he was wearing?

9    A    I believe he had on a yellow polo shirt.

10                MS. MATHEWS: Your Honor, I'd ask that the

11   record reflect that Officer Dedeluk identified Mr.

12   Thomas-Dawson as being at the scene.

13                THE COURT: So noted.

14   Q    Before you took off pursuing Mr. Brown, had you seen

15   Mr. Thomas-Dawson?

16   A    He was inside of the black Monte Carlo.

17   Q    Do you recall where he was inside of that vehicle?

18   A    Not at this time.

19                MS. MATHEWS: Thank you. I have no further

20   questions.

21                THE COURT: Cross examination?

22                MS. DIALLO: I'm sorry, Judge. Thank you.

23                **CROSS EXAMINATION**

24   **BY MS. DIALLO:**

25   Q    In fact you impounded a 1997 Chevy Monte Carlo, correct?

114

1    A     I believe that was the year.  I know I impounded a

2    black Chevy Monte Carlo.

3    Q     Would looking at your report refresh your recollection?

4    Or would you quibble with me if I say it's in your rerport?

5    A     I'm good with that.

6    Q     Okay.  Thank you.

7              So the person that you had contact with would

8    be the other person that ran away, correct?    That's the

9    one you effecuate the arrest on, correct?  Mr. Brown?

10   A     Correct?

11   Q     Okay.  Just one second.  I don't have another question

12   for you.  Thank you.

13              THE COURT:  Redirect?

14              MS. MATHEWS:  None, Your Honor.

15              THE COURT:  May this officer be excused?

16              MS. MATHEWS:  He may.

17              MS. DIALLO:  Yes, ma'am.

18              THE COURT:  Thank you officer.

19              THE WITNESS:  Thank you.

20              (The witness was excused at 2:50)

21              MS.   MATHEWS:   The   People   have   no   further

22   witnesses, Your Honor.

23              THE COURT:  Miss Diallo?

24              MS.  DIALLO:  Yes, Judge.  Just one second.

25   Your Honor, I'm sorry.  I was just asking Mr. Dawson a couple

1    of questions.  But now he does indicate that he has two

2    witnesses, Judge.  One at work.  And one that might be

3    present here.  As an officer of the Court I just can't tell

4    the Court that when my investigator interviewed and I talked

5    to Mr. Dawson a few times, I was not aware that there were

6    any witnesses in this particular case.  I believe the, and

7    I'm trying to get the memo from what I have about Mr. Dawson.

8    There was some indication when the investigator talked to

9    him that there were witnesses.  And if I might interview

10   my client, maybe for thirty seconds to a minute, I might

11   be able to ascertain the witnesses.

12            THE COURT:  You want to recess for about

13   five minutes?

14            MS. DIALLO:  Yes, ma'am.  Please.

15            THE COURT:  That's fine.

16            MS. MATHEWS:  All right.  Thank you.

17            (The Court recessed at 2:53)

18            THE CLERK:  Back on the record with

19   Thomas-Dawson.

20            (Back on the record at 3:03)

21            MS. MATHEWS:  Megham Mathews for the People.

22            MS. DIALLO:  Lillian Diallo on behalf of

23   Mr. Thomas-Dawson, who is present in front of me.

24            THE COURT:  How do you wish to proceed Miss

25   Diallo?

116

1          MS. DIALLO:  Your Honor, at this time defense

2     does have a motion.  I believe the prosecutor has rested.

3          We're doing a directed verdict for acquittal

4     on behalf of Mr. Dawson.  I can start with count one.  It

5     looks like there are three separate counts of felonious

6     assault.  I'm just trying to make sure Judge, they all apply

7     to the same person.  They appear they all apply to the same

8     person in this particular case.  So let's start with --

9     I know count one is robbery armed.

10         Count two is the FA, and count three is the

11    FA, felonious assault.

12         I would like to start with count six, if

13    that's okay with this Court, assault with intent to murder.

14         Your Honor, at this time there has been

15    nothing shown on this record that would substantiate a

16    finding of an assault with intent to murder.  Which is

17    750.506 (a).  The testimony was that there was some hitting

18    going on.  Mister -- I don't know, depending on the events,

19    even Mr. Gordon Johnson hit somebody and then they fired

20    or he didn't.  I'm not sure.  But, Judge, all we see at

21    this particular time is there is nothing to substantiate

22    count six.  Nothing whatsoever.

23         Count one, Judge, we don't believe the

24    prosecutor has met their burden on the robbery armed.  It

25    says in the course of committing larceny of cash and clothes

117

1   used force or violence against a person present. It seems
2   as if there was something going on between the two men that
3   would not rise to the level of robbery armed.

4   Count two and count three are the same
5   felonious assaults. So I would -- I don't know how that
6   works, Judge. It sounds like one assault that took place
7   and then there was some shooting. It looks like counts
8   two and three are for both defendant one. So we would,
9   Your Honor, at this time ask that one of those be dismissed.

10  Count four should be dismissed, we believe.
11  The carrying a concealed weapon. There has been nothing
12  on this record that shows that Mr. Thomas-Dawson pulled
13  anything or anybody saw him pull any kind of weapon. The
14  only time a weapon was -- they see a weapon is out -- and
15  we would ask that that count to fail as well.

16  Count five, is the felony firearm count,
17  Judge. That's going to, I believe that ultimately should
18  go to the trier of fact.

19  Then we have count seven -- maybe that's
20  in the alternative -- great bodily harm. We believe that
21  should fail as well, Judge.

22  And that's it for him. Thank you, Judge.

23  THE COURT: Miss Mathews?

24  MS. MATHEWS: Thank you, Your Honor. Your
25  Honor, I think looking at the evidence presented in the

1    light most favorable to the People that the Court certainly
2    can't dismiss any of those counts. The armed robbery,
3    certainly there was evidence presented to substantiate that.

4              Mister, I don't want to go into a closing.
5    But the Court heard the testimony, and heard from Mr. Johnson
6    and indicated that he was forced out of the gas station
7    by gunpoint by Mr. Thomas-Dawson. Once out in the parking
8    lot robbed of his True religion coat and his money in his
9    pocket. The testimony was pretty clear about that.

10             Your Honor, as far as the assault with a
11   dangerous weapon, the two counts, one of those was -- the
12   first one was that Mr. Gordon Johnson was struck by the
13   pistol by Mr. Thomas-Dawson. He indicated that. Not only
14   that but he got struck by the, in fhe face with a pistol.
15   He lost four of his teeth. Which we have evidence of those
16   four teeth and the blood there in the parking lot by pump
17   one in between the pump and the front door. Which of course
18   if corroborated by Mr. Bin Rabed.

19             Count three is assault with a dangerous weapon
20   and that's with the shots. Again, we have five pieces of
21   evidence that the Court is going to see or saw and heard
22   testimony about. Those being the five casing shots that
23   were collected there. As well as Mr. Johnson's testimony,
24   as well as Mr. Mohammed Bin Rabed indicating that he heard
25   shots.

1          Mr. Johnson indicated that he saw Mr.
2    Thomas-Dawson shooting at him. If that's not felonious
3    assault, Your Honor, certainly in the light most favorable
4    to the prosecution. That one should also stand.

5          As far as the carrying a concealed weapon,
6    Mr. Bin Rabed indicated that he didn't see the weapon when
7    Thomas-Dawson, Mr. Thomas-Dawson came into the gas station.
8    Why not? Because it was concealed. It was concealed until
9    he came up to the side of Mr. Johnson, as Mr. Johnson
10   testified, and shoved it into his ribs. At which point
11   Mr. Johnson looked down, saw the weapon, looked over his
12   shoulder and looked right into the face of Mr. Thomas-Dawson.

13         Again, Your Honor, felony firrearm, I think
14   that has been established as well from the testimony of
15   all of the witnesses.

16         The assault with intent to murder, Your Honor,
17   the defendant tried to physically injure Mr. Thomas-Dawson,
18   that's pretty darn clear. He struck him in the face with
19   the firearm. He took out all of his teeth. When that wasn't
20   enough and Mr. Johnson took off running, Mr. Thomas-Dawson
21   shot at least five times at Mr. Dawson. The most that we
22   got was 30 feet away. Thank God he didn't hit him.

23         And then the assault to do great bodily harm
24   less than murder. Again, Your Honor, we heard the testimony.
25   We saw the evidence; the four teeth sitting there, Mr.

120

1   Johnson with the gash over his head, his jaw swollen and
2   discolored, his missing teeth, the injuries are substantial.
3           Your Honor, we would ask that the Court deny
4   the motion, the defense motions for directed verdict.
5           THE COURT:  Viewing the evidence in the light
6   most favorable to the People a rational trier of fact could
7   find that the elements of the charged offenses have been
8   proven beyond a reasonable doubt.  The Court is going to
9   deny the defendant's motion for directed verdict.
10          Do you have any witnesses, Miss Diallo?
11          MS. DIALLO:  Judge, I do not believe at this
12  time that we have any witnesses  after I spoke with my
13  client.
14          I would ask the Court to voir dire Mr. Donnie
15  Thomas-Dawson on if he wants to testify or not.  I did
16  explain to him that he has a constitutional right to testify
17  or to remain silent, and that this Court would not use his
18  silence against him.  Ultimately I told him it is his
19  decision whether he would like to testify or not to testify.
20          THE COURT:  Can you swear the defendant?
21          THE CLERK:  Can you stand and raise your
22  right hand.
23          "Do you solemnly swear or affirm the testimony
24          you are about to give to the Court to be
25          the truth, so help you God?"

121

1          THE DEFENDANT: Yes.

2          (The defendant was sworn at 3:11)

3          THE COURT: Mr. Thomas-Dawson, do you

4    understand that you have an absolute right to remain silent?

5          THE DEFENDANT: Yes, Your Honor.

6          THE COURT: If you chose to exercise your

7    right to remain silent, you know that I cannot hold that

8    against you? Do you understand that?

9          THE DEFENDANT: Yes, Your Honor.

10         THE COURT: Do you wish to testify?

11         THE DEFENDANT: No.

12         THE COURT: Okay. You've had a chance to

13   talk to your attorney?

14         THE DEFENDANT: Correct.

15         THE COURT: And that's your decision, is

16   that right?

17         THE DEFENDANT: Yes.

18         THE COURT: All right. Miss Diallo didn't

19   tell you not to testify?

20         THE DEFENDANT: No, Miss Diallo didn't ell

21   me not to testify.

22         THE COURT: Very well. Thank you, Mr.

23   Thomas-Dawson. Are we ready for closing arguments?

24         MS. DIALLO: At this time, Your Honor, I

25   believe defense does rest. There are no witnesses that

1  defense is going to call. After speaking with Mr. Dawson,

2  he does agree. Is that correct, sir?

3                THE DEFENDANT: Yes, that's correct.

4                MS. DIALLO: Thank you.

5                THE COURT: Miss Mathews.

6                MS. MATHEWS: Thank you, Your Honor. Your

7  Honor, at the beginnning of the trial I indicated to you

8  that we'd be hearing from a number of witnesses. And in

9  fact we did.

10               We first heard from Mr. Gordon Johnson, who

11  indicated that he was working at the Valero gas station

12  at 10100 East Warren, City of Detroit, County of Wayne at

13  approximately 2:20 in the morning. That at that time he

14  was assisting the cashier cleaning up stock and whatnot.

15  While he was standing there waiting to let people out of

16  the gas station proper so that he could lock up after them

17  he was approached by Mr. Donnie -- I'm sorry, Mr. Donnie

18  Thomas-Dawson, Mr. Thomas-Dawson came up to the side of

19  him and pursuant to the, according to the testimony of

20  Mr. Johnson shoved a gun into the side of his ribs. Mr.

21  Johnson looked over his shoulders and looked right in the

22  face of Donnie Thomas-Dawson.

23               Mr. Thomas-Dawson instructed Mr. Johnson

24  to exit the gas station. According to the testimony, which

25  was corroborated by Mr. Bin Rabed. I'm sorry if I'm

1    demolishing that. They walked out towards a dark colored
2    vehicle that is parked at pump one. At which time another
3    man comes out, according to Mr. Johnson, who is dressed
4    in a tan Carhartt jacket. Mr. Donnie Thomas-Dawson has
5    the gun to Mr. Johnson. The second man, who has been
6    identified as Mr. Brown, starts coming up going through
7    his pockets demanding what else have you got? Taking the
8    jacket and the money from him.

9              Mr. Dawson, when he said, when Mr. Johnson
10   indicates I don't have anything else. Mr. Thomas-Dawson
11   strikes him in the face with the gun knocking out his teeth
12   and Mr. Brown continues to hit him. At which point Mr.
13   Johson says that Mr. Brown goes back towards the gas station
14   and Mr. Johnson takes off running. He says as he's taking
15   off runnning hears shcts, he looks over his shoulder and
16   he sees Mr. Thomas -Dawson with the gun shooting at him.
17   He thought five or six shots.

18             He leaves the scene and goes across the street
19   sees Mr. Thomas-Dawson jump into the Monte Carlo with the
20   plastic in the back window along with Mr. Brown and take
21   off at a high rate of speed up East Warren Avenue. At which
22   point Mr. Johnson comes back to the station.

23             In the meantime Mr. Bin Rabed, who has
24   witnesses this, indicaced that he saw Mr. Thomas-Dawson
25   in the store, saw him walk out with Mr. Johnson. And

1    honestly admittedly said, I didn't see the gun.' Sees them

2    fighting out there. He calls the police. The police arrive.

3                      We also heard, Your Honor, from Breaun

4    Glasper, who indicated that 20 minuntes later and less than

5    five blocks away on Chalmers, she was with a Mr. Poindexter

6    and they arrived at a liquor store. When they pull into

7    the parking lot of the liquor store she observes a black

8    Monte Carlo with a black plastice in the back window and

9    a gentleman standing outside of that vehicle in a black

10   tan -- I'm sorry, in a tan Carhartt jacket. They go into

11   the liquor store. And when they come out she indicates

12   that she observes, who has later been identified as Mr.

13   Brown in the tan Carhart jacket and Mr. Donnie Thomson-

14   Dawson coming at her with Mr. Brown is armed with a gun.

15                      She indicated that the next day, the 28th,

16   she went to the Detroit Detention Center and picked out

17   Mr. Dawson from that lineup. I'm sorry, as did Mr. Johnson

18   that very next day. Mr. Johnson, also, Your Honor, gave

19   a written statement. He indicated on the record, though,

20   that he is illiterate. And that he told everyone what

21   happened. Honestly, he couldn't read whether or not what

22   he had told them was accurately depicted.

23                      Mr. Bin Rabed, also indicated that, although

24   he understands English, that his statement which he gave

25   to the prosecutor's office investigator in May was

125

1    interpreted by his manager.  Not  licensed interpreter.

2    And that he just told them what happened.  And signed the

3    statement also.

4               Your Honor, we then heard from the officer

5    who had secured the scene at the gas station.  He did

6    indicate that he was aware there was some video.  He never

7    saw the video.  He wasn't sure if it was working or not.

8    But he didn't see it.  He didn't acquire that video.

9               We heard from Officer Diaz who indicated

10   that he had processed the scene, took a number of photographs

11   and prepared a diagram.  All of which were admitted into

12   evidence.  Your Honor, those photographs, in particular

13   People's exhibit 16, 17, 18 and 26 show the teeth that were

14   knocked out of Mr. Johnson's mouth lying on the pump, lying

15   on the ground in between pump one and the front door, which

16   was also indicated in the diagram.

17              He also indicated that photographs nine thru

18   20, I'm sorry, 9, 20 and 22 and 24 accurately reflect the

19   injuries sustained by Mr. Gordon Johnson as a result of

20   the assault made on him by Mr. Thomas-Dawson.

21              Your Honor, I think that the testimony and

22   the evidence presented clearly met the burden beyond a

23   reasonable doubt that Mr. Thomas-Dawson armed with the

24   firearm and assisted by Mr. Brown robbed Mr. Gordon Johnson

25   in the course of committing a larceny of his True jacket,

1   or True Religion jacket and his money, while he was armed

2   with a handgun.

3          Additionally, Your Honor, I do believe that

4   the testimony presented and the evidence presented

5   demonstrate beyond a reasonable doubt that Mr. Thomas-Dawson

6   made an assault upon Gordon Johnson while armed with a

7   pistol, dangerous weapon a pistol, by hitting him and

8   knocking out his four teeth.

9          He also, in a separate act, Your Honor, made

10  a felonious assault upon Mr. Johnson by, with a dangerous

11  weapon by firing those five shots. Evidence of which are

12  the five casings that were located there in that area.

13         I also believe, Your Honor, and I think the

14  evidence shows that Mr. Thomas-Dawson when he came into

15  that gas station he did conceal a weapon. I think that

16  testimony, I think that evidence has been uncontroverted.

17         The clerk indicated 'I didn't see it.' He

18  came up. He bought a cigar or cigarette or something of

19  that nature and then walked over to Mr. Johnson. Mr. Johnson

20  said, he didn't see it until it was poking in his ribs.

21  So Tommy Dawson, I'm sorry, Thomas-Dawson had it in his

22  side and ordering him out the door. Clearly, Your Honor,

23  Mr. Thomas-Dawson was armed with a firearm at the time he

24  committed all of the felonies.

25         As far as the assault with the intent to

1    murder Mr. Dawsson attempted to physiclly injure Mr. Gordon

2    Johnson. He had the ability to do so, he was armed with

3    that firearm and he took five shots. Thankfully he's a

4    bad shot and he missed. In doing that, and in shooting

5    five shots at somebody running away he had the intent to

6    murder him.

7                    Finally, of cousre, Your Honor, I believe

8    the fact that hitting Mr. Gordon Johnson with that firearm,

9    knocking out his four teeth that shows that he had the

10   ability and the intent and in fact did inflict great bodily

11   harm less than murder on Mr. Johnson.

12                   We ask, Your Honor, that the Court review

13   all of the testimony and the exhibits presented. And would

14   urge the Court to find Mr. Thomas-Dawson guilty on all

15   counts. Thank you.

16                   THE COURT: Miss Diallos.

17                   MS. DIALLO: May I, Judge? Thank you. Judge,

18   before we get started, my client wishes to have the DVD

19   admitted into evidence for defense to give it. Your Honor,

20   can look at it if she wants. There is a DVD of the scene,

21   a video of the scene that the prosecutor's provided, correct?

22                   MS. MATHEWS: No.

23                   MS. DIALLO: Judge, well never mind. Mr.

24   Thomas-Dawson withdraws that. Don't you, Mr. Thomas-Dawson?

25   Yes, he does.

1          THE DEFENDANT:  Correct.

2          MS. DIALLO:  Thank you.  Judge, you had the

3   opportunity to listen to the testimony in this particular

4   case.  My client is charged with that robbery armed.  And

5   part of robbery armed Judge, they do have an assault that

6   is built into that.  So if in fact they're charging correctly

7   they overcharged the person that did that.  But in any event

8   when we go to the elements it's going to be, I guess

9   credibility.

10              There was a youngman, Mr. Gordon Johnson,

11  he admitted he smokes a little weed.  He starts early in

12  the morning and he's a smoker.  And he had smoked that day

13  when this occurs.  And that the person had on a yellow shirt.

14              What's interesting is the only person in

15  the lineup that's picked out is the only person in the lineup

16  that has on a yellow shirt.  And a yellow shirt would stand

17  out in a lineup.  It's not unique.  People do have yellow

18  shirts and other people would wear them, especially Michigan

19  fans 'Go Blue.'  But in any event, Judge, that's not unique

20  to any one person.  But when you put someone in a lineup

21  and one of the things, the only thing that's common is a

22  yellow **shirt, then of course they're going to pickout Mr.**

23  **Thomas**-Dawson because he's the only one that had on a yellow

24  shirt.

25              As far as the attempted murder is concerned,

129

1    Judge, I absolutely believe that he should be found not
2    guilty on that. The elements for that are that the defendant
3    would physically try to injure somebody, and if he had the
4    ability to cause an injury and that the intent at the time
5    he caused that injury was to kill. That record is absolutely
6    void as to that particular element. We have seen no medical
7    records, no documentation, anything that would support that
8    kind of crime being charged against Mr. Thomas-Dawson.
9    So we would object to, we would ask that you find him not
10   guilty on that as well.

11           Your Honor, the felonious assault, I think
12   what they did is they took one incident and they parcelled
13   it out. They said, okay, for this robbery, you're going
14   to get the felonious assault, two felonious, two or three
15   felonious assaults, great bodily harm less and attempted
16   murder all wrapped into one, Judge. We don't believe that
17   that is appropriate.

18           Mr. Thomas-Dawson was picked out we believe
19   simply because of that yellow shirt. There was nothing
20   about facial hair and nothing about a knot on his head.
21   No scarring or anything. If you look at, I believe, one
22   of the pictures that was admitted, and I believe it was
23   People's 66 the lineup photograph you can see in the picture
24   this man has hair on his face. It's not unique. In this
25   day and age unfortunately to have people with these big

1   Afros, Judge.  So that's, we don't believe that's a big

2   identifying factor that should condemn Mr. Thomas, Donnie

3   Thomas-Dawson for the crimes that have occurred.

4             I'm not quite sure there was a robbery armed.

5   Because at first you never said anything about marijuana.

6   And now, okay, there was some marijuana out there.  'That

7   was mine.  It was in my pocket.'  So maybe something else

8   was going on other than a robbery in this particular case.

9   Because Mr. Bin Rabed said, they were talking.

10            It didn't seem as if there was anything amiss

11  with in that gas station itself.  He's working.  He's paying

12  attention.  He did not see anything happen and then he hears

13  a commotion.  He sees they're fighting.  Fighting, this

14  is what he said.  And then on the ground.  And then the

15  one gentleman, Mr. Johnson, goes one way and there are two

16  other people go the other way.  So, Judge, we don't believe

17  that that rises to the level of a robbery armed.

18            And what is interesting, if you say within

19  20 minutes, then these are the people that we think did

20  this, you didn't collect any money, $20.00 or $30.00 dollars

21  off  of Mr. Donnie Thomas-Dawson.  You don't get a True

22  Religion jacket from Donnie Thomas-Dawson.  And you don't

23  get a gun from him as well.  And he was searched.

24            Judge, at this time we would ask that

25  consideration of the evidence that you find him not guilty

131

1   because he's not the one that committed these crimes.   Thank

2   you so much.

3               THE COURT:   Rebuttal?

4               MS. MATHEWS:   Just very briefly, Your Honor.

5   First the People would point out that the armed robbery

6   of, and the assault, and the felonious assault, the first

7   instance happened at 12:30.   Miss Glasper indicates that

8   she sees Mr. Dawson, Mr. Thomas-Dawson and Mr. Brown 20

9   minutes later about four or five blocks away.   And that,

10  in fact, they're not arrested until 1:50 as the officer

11  testified.   So approximately, about an hour after Miss

12  Glasper sees them.

13              Further, Your Honor, that testimony indicated

14  from the Officer Dedeluk indicated that he saw Mr. Brown

15  at the, as he pulled into the gas station when they observed

16  the black Monte Carlo with the plastic in the window and

17  that Mr. Brown took off.   I specifically asked him, did

18  you lose sight of him at some point?   They did.

19              So, Your Honor, it's the People's position

20  particularly since Miss Glasper inidicated that Mr. Brown

21  had the weapon when she saw him 20 minutes later that Mr.

22  Brown ditched that weapon.   I think that's a reasonable

23  conclusion that the Court, the finder of fact could make.

24              Your Honor, I think that all of the witnesses

25  were reliable in their statements.   That they all, none

1    of the three of them are related in anyway other than by
2    circumstance. I think those are also factors that the Court
3    should consider in reaching its decision.
4              Again, Your Honor, we would ask that the
5    Court find Mr. Donnie Anthony Thomas-Dawson guilty on all
6    counts.
7              THE COURT: Correct me if I am wrong. The
8    People admitted exhibits one thru four and then six thru
9    65 or 66?
10             MS. MATHEWS: Sixty-six is the highest, Judge.
11             THE COURT: So there was no People's five?
12             MS. MATHEWS: Actually it was one thru twelve,
13   Your Honor.
14             THE COURT: I have one thru four and then
15   six thru 66. No five.
16             MS. DIALLO: I don't have five at all, unless
17   I missed it Judge. Because they were entering --
18             MS. MATHEWS: I don't have a five but I do
19   have one thru four. Yes, you are right. I'm sorry.
20             THE COURT: And defense admitted exhibits
21   (a) thru (f)?
22             MS. DIALLO: Correct.
23             THE COURT: I'd like to have all the exhibits.
24             MS. MATHEWS: Yes.
25             THE COURT: I'm looking at Monday, February

133

1      22nd.

2                     MS. DIALLO:  I'm in trial, a homicide trial

3      with Judge Kenny.  We could do it maybe in the afternoon

4      that day?  That would be great.

5                     MS. MATHEWS:  Anytime that the Court's going

6      to --

7                     THE COURT:  Just come down on your break.

8                     MS. DIALLO:  Thank you, Judge.

9                     MS. MATHEWS:  Thank you.

10

11                     (The proceedings concluded at 3:31)

12

13                     *              *              *

14

15

16

17

18

19

20

21

22

23

24

25

134

```
 1                    CERTIFICATE OF COURT REPORTER

 2

 3      STATE OF MICHIGAN )

 4                       )    SS:

 5      COUNTY OF WAYNE   )

 6

 7           I, Gary Coury, Certified Court Reporter, do hereby

 8      certify that I reported the proceedings had in the

 9      above-entitled matter of

10           The People of the State of Michigan

11                            v

12           DONNIE THOMAS-DAWSON,

13           Case Number 15-1533,

14      at the time and place hereinbefore set forth, and that the

15      foregoing transcript consisting of  ONE HUNDRED AND

16      THIRTY-FIVE (135  pages, is a full, true, and accurate

17      transcript of the proceedings so taken.

18

19

20

21

22

23      DATE _____         Gary Coury
                                     Certified Court Reporter
24                                   CSMR/CER 3827

25
```

135